Btjrke, J.
This is an action to recover damages for personal injuries allegedly sustained by the plaintiff, Eve Marie Feblot, while she was entering an elevator in the New York Times Build *488 ing at No. 229 West 43rd Street, in the Borough of Manhattan, City of New York. The building was owned by the defendant, The New York Times Company, hereinafter designated “ Times.” The elevators in the building were serviced by the defendant, Westinghouse Electric Corp., hereinafter designated “ Westinghouse.”
Miss Feblot, a professional masseuse then 63 years of age, had previously gone to the private office of Arthur Hays Sulzberger, the president and publisher of the New York Times, on the 14th floor of the building, to give Mr. Sulzberger a massage treatment. The accident occurred while she was entering one of the self-service elevators on the 14th floor of the building in order to leave the building. Miss Feblot claimed that, while she was entering the elevator, the door in the elevator cab, which was equipped with a rubber safety edge, suddenly closed and struck her right shoulder and arm with such force that it is claimed it injured her shoulder.
At the close of the plaintiff’s case the complaint was dismissed against Westinghouse on the ground that the plaintiff failed to establish a prima facie case against said elevator service company and the court denied the motion of Times to dismiss and for a directed verdict, after initially reserving decision on said motions. At the close of all the evidence the court reserved decision on the renewed motions of Times to dismiss and for a directed verdict under CPLB 4401. The case was thereafter submitted to the jury against Times solely on the theory of res ipsa loquitur and the jury rendered a verdict in favor of the plaintiff. The court denied the motion of Times to set aside the verdict and, in addition thereto, denied the motions of said defendant for a dismissal and for a directed verdict, on which decision had previously been reserved.
The appeal presents two questions: (1) Was the doctrine of res ipsa loquitur applicable under the facts here presented? and (2) Did the Trial Justice err in excluding from evidence the written accident report of Zaccor, and in refusing to allow Zaccor to give the complete account of the accident, as reported to him by the receptionist, Griffin, after the door therefor had been opened on the plaintiff’s cross-examination of Zaccor?
The answer to question 1 is: No. The answer to question 2 is: Yes.
*489 The treatment took about an hour and when Miss Feblot left Mr. Sulzberger’s office, Griffin, the receptionist, accompanied her out to the corridor where the elevators were located and, according to Miss Feblot, then left her standing there “ alone ” in the corridor. She testified that she rang the bell for an elevator located on her right-hand side of the corridor and then stood ‘ ‘ very near ’ ’ the door of the elevator, waiting for the elevator to arrive at the 14th floor.
On direct examination Miss Feblot described the accident, which occurred after the elevator arrived at the 14th floor and the door opened, as follows: “ I went half in, I remember it was first with my right arm and my right leg, and suddenly, abruptly, and terrifically quickly, the door closed and gave me a terrific blow on my arm. It was so terrible I cried out.”
She testified that, after she ‘ ‘ cried out ’ ’, Griffin, the receptionist from Mr. Sulzberger’s office, “ came quickly back” to where she was standing and that she had a conversation with him. She testified that, after she got home, she felt “ very sick and very miserable ’ ’ and placed ‘ ‘ ice packs with witch hazel ’ ’ on her right “ arm.” Although Dr. Robert L. Preston, the only medical witness called by the plaintiff, who first saw Miss Feblot nearly a year after the accident, claimed on direct examination that the middle third of the deltoid muscle in her right shoulder was ‘1 ruptured away from its bony attachment at the shoulder ’ ’, on cross-examination he admitted that the deltoid muscle ‘ ‘ may be ruptured or it may not be ruptured ”—he “ didn’t know.” He also admitted that the atrophy in the muscle of Miss Feblot’s right shoulder was undoubtedly due to the bursitis in the right shoulder from which she admittedly had been suffering and for which she admittedly had been receiving cortisone injections for years.
On cross-examination by Times, Miss Feblot testified that the only thing that she was carrying at the time of the accident was a hand bag, which she held in her right hand. She couldn’t remember whether or not she was wearing her glasses at th® time of the accident and, although she admitted that Griffii1escorted her out to the corridor when she left-Mr. Sulzberger’® office, she couldn’t remember the distance between the point where she claimed that Griffin left her in the corridor and th® point in the corridor where she claimed that she was standing *490 while she was waiting for the elevator—which had a material bearing on the question of whether or not Griffin saw the accident. When the elevator arrived she was standing in the middle of the elevator doors facing them. She claimed that the elevator door opened only “ halfway ”, but she couldn’t say how many seconds it took for it to open. When she was asked how far away from the elevator door she was standing when it opened “ halfway ”, she testified, “ I was very near ” the door. She could not, however, recall exactly how near to the elevator door she was at this time but, upon further questioning, she indicated that she was approximately eight inches away from the door. She claimed that she then stepped into the elevator with her right foot, which she placed down inside the elevator cab, with her right shoulder approximately 18 inches away from the elevator door and, although she at first testified that her left foot was “positively” not in the corridor at the time, she later claimed that her left foot was flat on the floor of the corridor outside the elevator while her right foot was inside the elevator. She claimed that she was in this position when the elevator door closed “ instantly ” on her, but she couldn’t remember how long it took the elevator door to close after it had opened, and that the door struck her “ terrifically in my arm ”. When she was asked if the door closed faster than it opened, she testified, “ It closed much faster.” She didn’t know whether or not the elevator door had a rubber safety edge on it, nor could she recall whether or not the door opened again after it came into contact with her body. She did, however, admit that the contact was not sufficiently violent to knock her down.
The elevator in question was not a single-door elevator, as Miss Feblot claimed at the trial, but was equipped with a pair of ‘ ‘ side opening ’ ’ doors, one of which slid behind the other, and both of which opened and closed from one side of the elevator, as distinguished from ‘ ‘ center opening ’ ’ doors, where each of the doors opens in opposite directions.
, On cross-examination by Westinghouse, Miss Feblot testified that, when the elevator door closed on her right shoulder, she stopped out of the elevator “very, very quickly”, which suggests that the door opened again when the rubber safety edge came into contact with her body. Despite her earlier attempts to deny it, she admitted that she had previously made a claim *491 against Travelers Insurance Company for an injury she claimed that she sustained when she caught her finger in the gate of an elevator in the town house of Mr. and Mrs. Widener on East 70th Street.
On redirect examination Miss Feblot admitted that, immediately after the accident, she reported the occurrence to Griffin and that she later reported it to Mr. Sulzberger himself.
As part of her affirmative case the plaintiff read from the deposition taken on an examination before trial of Donald DeForest, who had been an elevator inspector for Westinghouse stationed at the Times Building for three years at the time the accident occurred. DeForest testified that, on June 29, 1964, there were eight passenger elevators servicing the 14th floor of the Times Building, four of them being located on each side of the corridor on that floor. The No. 8 elevator, which is the one involved in the case at bar, was the first elevator on the right side of the corridor. DeForest testified that in 1963 this elevator had been converted from a manually operated to an automatic ‘ ‘ Selectromatic ’ ’, self-service operated elevator. The elevator was equipped with “ side opening ” doors, which, as already noted, means that both doors, one of which slides behind the other, opened and closed from one side of the elevator.
DeForest further testified that on June 16,1964, less than two weeks before the accident herein occurred, he inspected the No. 8 elevator because ‘ ‘ There was a complaint that the doors were delaying ” in closing and that he found that the cause of this delay was ‘ ‘ a dirty contact for the light source for the electric eye ’ ’ on the door. As he explained, ‘ ‘ I found a contact in the light source wasn’t making, and that meant that the electric eye circuit wasn’t completed in the door, and the door would just delay in closing for the time, and then it would nudge after twenty-six or twenty something seconds.” This electric eye is located “ in the buck ” or the “ striking jamb ” of the door and it regulates the time interval that the door remains open, depending upon whether or not passengers are entering the elevator. If no passenger is entering or leaving the elevator after it stops at a landing, it takes “ seven seconds ” for the doors to close but if people are entering or leaving the elevator or someone is standing in front of the electric eye, thus causing the doors *492 to remain open, after 20 seconds the doors will automatically begin to “ nudge ” close “ with a warning buzzer ”, and will then close completely. If no one is standing in front of the beam of the electric eye but the beam is momentarily broken by someone passing in front of it while entering or leaving the elevator, however, the door will take ‘ ‘ about a second and a half ’ ’ to start to close after the beam has been thus broken by a passenger and another ‘‘ Four-and-a-half seconds ’ ’ to fully close.
DeForest testified that, when he inspected the elevator on June 16, he found that “ the traffic sentinel,” which is the light source that completes the beam, ‘1 was not working due to a dirty contact, causing the-car to sit longer at the floor, delaying it to that twenty seconds and then going into nudging and closing.” To remedy this condition he went to the motor room on the 16th floor of the building, where the control panel is located, and removed and cleaned and then adjusted the contact in this particular electrical circuit. He did nothing to the elevator itself or to the electric eye in the door jamb or the door buck on the 14th floor, however. After this, ‘ ‘ the light source came on ’ ’ all right and “ everything was O.K.” again. DeForest also rode the car “ to make sure it was all right ” and he testified that “ I seen that it [the door] didn’t have to wait to nudging to close ” but that “ It closed after the first beam was broken.” He testified that he rode the elevator down in the shaft and that “ The doors opened and people got on and it shut ” normally. He testified that, after he cleaned the dirty contact, the timing on the doors was “ all right, everything was all right ” and that the doors then opened and closed “ normal ”.
When DeForest was asked how long it would normally take the doors to close after they started to close, he estimated that it would take about “ Four-and-a-half seconds ” for the doors to fully close. He further testified that no complaints were made about the doors closing too rapidly for a period of six months prior to his inspection on June 16, 1964, and that the normal time for the closing of the doors was not affected in any way by the work that he- did on this date.
During the colloquy between the court and counsel at the close of the plaintiff’s case, the plaintiff’s counsel made it clear that the plaintiff was relying exclusively on the doctrine of res ipsa loquitur, whereupon the court asked counsel if he could cite *493 ‘1 any cases that hold the applicability of res ipsa to a closing elevator door. ” The only cases that the plaintiff’s counsel could cite, however, were cases involving defective interlocks, which enabled the shaft doors of elevators to be opened when the elevator was not at the floor landing, which are clearly distinguishable from the case at bar. The Trial Justice informed counsel that ‘11 should like to see some cases involving elevator doors striking plaintiffs, where the Courts have held that it is res ipsa. I would feel a lot better if you could give me one of those cases. That would resolve my problem immediately.” The plaintiff’s counsel, however, was unable to cite any such case.
Times called only one witness, namely Eugene Zaccor. Zaccor, who had then been in the employ of Times for 16 years, was a security officer and the safety co-ordinator for said defendant on the date that the accident herein occurred. He had previously been sent to school by Times to be trained in safety procedures. He corroborated the testimony of Miss Feblot that Griffin was the receptionist in the office of Mr. Sulzberger on the date that the accident herein occurred but he testified that Griffin had left the employ of Times in October, 1966, and that his whereabouts at the time of the trial was unknown.
On direct examination Zaccor testified that on the morning after Miss Feblot claimed that she was injured while entering one of the elevators on the 14th floor of the Times Building, he received an oral report of the accident from Griffin. He went up to the 14th floor of the Times Building which is the top floor of the building, and inspected the opening and closing of the door of the elevator on which the accident is claimed to have occurred, which he identified as the No. 8 elevator, and found nothing whatever wrong with the manner in which the elevator arrived at the 14th floor and the doors opened, that they remained open for 15 to 20 seconds waiting for someone to enter the f elevator and that, when the doors started to close, it took thenV between 4 and 5 seconds to close completely. When he was asked if the doors closed suddenly, abruptly and instantly, hfa testified that they closed like the doors on any other elevator.
The witness testified that at the time that the accident herein is alleged to have occurred between 5,000 and 6,000 people worked in the Times Building and that approximately another *494 1,000 people entered the building daily for one reason or another. Despite the great number of people that were entering and leaving the building daily, he had never received any report prior to or subsequent to June 29, 1964, of any accident occurring on the No. 8 elevator.
It is undisputed that, after he inspected the No. 8 elevator, Zaccor submitted a written report to Times. On direct examination, however, he was not asked a single question bearing on the content of this report. The following is the only question pertaining to this report asked the witness on direct examination : ‘ ‘ And you made a report of this incident in writing, did you not? ” Zaccor answered, “Yes, I did.”
The major portion of the cross-examination of Zaccor was devoted to the content of the written report of the accident, which the witness made in the regular course of his duties as the safety co-ordinator for Times and thereafter filed with his superiors.
On redirect examination Zaccor was asked about the 1 ‘ safety edge ” on the side of the elevator door and he described this safety device as “ a rubber cushion type substance, about two inches thick, which is on the edge of the inside door of the elevator ’ ’ or the door that slides behind the outside door, which, when it comes into contact with the body of a person entering or leaving the elevator, “ prevents the door from closing any further ” and causes it to automatically “reopen”. He testified that, when he inspected elevator No. 8 the morning after the accident herein occurred, he touched this safety edge on the door of the elevator and found that it was in “ Normal working order ”.
It was error for the Trial Justice to allow the jury to fix liability in this case under the doctrine of res ipsa loquitur. A jury finding of liability under this doctrine could only be based on speculation, and, if there is any principle of law that is too well settled to require extensive citation of authority, it is that a jury finding based on speculation is a nullity (Lahr v. Tirrill, 274 N. Y. 112, 117).
{ The court should have charged the jury as in the ordinary Negligence action on negligence and freedom from contributory negligence. Of course, in all negligence cases the fact of negligence can be proven circumstantially. If the jury believes that the obxrxr glosed the way plaintiff testifies, then that is circumstantial evidence that the mechanism which controlled it may *495 have been defective or poorly maintained. Or if the jury believes DeForest and Zaccor that the equipment was in good working order, the jury weighs that testimony against that given by the plaintiff.
The case at bar falls within the doctrine of Digelormo v. Weil (260 N. Y. 192,199-200) that “ where the evidence is capable of an interpretation which makes it equally consistent with the absence as with the presence of a wrongful act, that meaning must be ascribed which accords with its absence.” The proof in this case is not only ‘1 equally consistent with the absence as with the presence ” of negligence on the part of Times in the maintenance of the elevator involved herein, but there could be an inference that Miss Feblot did not, as she claimed at the trial, start to enter the elevator as soon as it arrived at the 14th floor and the doors opened but that she stood in the corridor talking to Griffin and then made a frantic effort to enter the elevator while the doors were closing.
In the case of Manley v. New York Tel. Co. (303 N. Y. 18, 25-26), it was held to be error to allow the jury to charge the defendant with negligence under the doctrine of res ipsa loquitur in a case where the plaintiff received an electric shock while he was using a telephone, ‘1 Whether the rule of res ipsa loquitur is to be applied depends upon 1 whether, upon ‘ ‘ a common-sense appraisal of the probative value ” of the circumstantial evidence, measured in part by the test of whether it is the best evidence available, inference of negligence is justified ’ ” and such an inference is ‘ ‘ ‘ the only one which can fairly and reasonably be drawn from ’ ” the facts.
We have held that the doctrine of res ipsa loquitur is only applicable, to employ the language of Chief Judge Funn in Abbott v. Page Airways (23 N Y 2d 502, 510): “ [I]f the instrumentality causing the injury to the plaintiff was ‘ in the exclusive possession and control of the person charged with negligence * * * and * * # the accident would not ordinarily have occurred without neglect of some duty owed to the plaintiff ’. (Galbraith v. Busch, 267 N. Y. 230, 234; see, also, Foltis, Inc. v. City of New York, 287 N. Y. 108, 114-115, 116-117; Manley v. New York Tel. Co., 303 N. Y. 18, 25.) ”
In the falling elevator and defective interlock cases the injured plaintiff had no control whatever over the mechanism of the *496 elevator responsible for the accident. In the case at bar Miss Feblot had as much, if indeed not more, control over the operation of the doors of the elevator than Times did because she was the one who activated the mechanism which controlled their operation. Furthermore, she was the one who determined when and how and under what circumstances she would enter the elevator. Even if the doors started to close while she was partially in and partially out of the elevator, as she claimed at the trial, she still had it within her power to cause them to instantly reopen automatically by merely touching the rubber safety edge on the inside of the door with her hand, as countless people entering and leaving elevators routinely do every day when the door of an automatic self-service door starts to close before they are completely inside or outside the elevator, as the case may be.
The Appellate Division in the Second Department recently stated in Cameron v. Bohack Co. (27 A D 2d 362, 364): “ The requirement of exclusive possession and control is not an absolutely rigid concept. It implies that the possession and control of the defendant over the instrumentality are of such a character that the probability that the negligent act was caused by someone other than the defendant is so remote that it is fair to permit an inference that the defendant is the negligent party. It is under these circumstances that ‘ the thing speaks for itself ’ and that the trier of the facts may draw an inference of negligence against the defendant. If this characteristic of possession and control is absent, the doctrine is not applicable (Godfrey v. County of Nassau, 24 A D 2d 569; Murphy v. City of New York, 19 A D 2d 545, affd. 14 N Y 2d 532; Mercatante v. City of New York, 286 App. Div. 265, mot. for rearg. and for lv. app. den. 286 App. Div. 964).”
The Supreme Court of Florida in Thomason v. Miami Tr. Co. (100 So. 2d 620), where a paying passenger on a passenger bus operated by the defendant was struck by a closing door as she was alighting from the bus, said 11 the mere happening of an accident raises no presumption of negligence * * * We
do not consider this a case for the application of the doctrine of res ipsa loquitur. ’ ’ Here, too, such an extension of liability is indefensible.
Furthermore, the Trial Justice committed another error in excluding from evidence the written accident report of Zaccor *497 and in refusing to allow Zaccor to give the complete account of the accident reported to him by the receptionist, Griffin, after the door therefor had been opened by the plaintiff on the cross-examination of Zaccor.
On cross-examination it was brought out by the plaintiff’s counsel for the first time that the written report of Zaccor was based on “ Mr. Griffin’s comments ” and was submitted by Zaccor directly to his superiors at Times. However, the written accident report which Zaccor testified was based on Griffin’s oral report of the accident declared that Griffin had told Zaccor that the accident occurred in an entirely different manner than the manner claimed by the plaintiff.
On redirect examination Zaccor was asked to relate what Griffin had told him ‘ ‘ concerning the happening of the accident ’ ’ but an objection by counsel for the plaintiff to this line of questioning was erroneously sustained by the court. At the conclusion of Zaccor’s re-cross-examination, counsel for Times, in order to leave no doubt as to his position, made the following offer of proof:
‘1 Mr. Coughlin: If you will recall, sir, on cross examination Mr. Long asked the last witness concerning conversations that the witness had with one Paul Griffin, and he asked specifically about medical care and the refusal of the offer. He asked specifically about the elevator door hitting her. He asked specifically about Griffin’s saying that she was entering the door. He asked specifically about the door striking the woman, and he asked specifically about the identification of the elevator.
“ Now, sir, I take the position that in view of those questions concerning the conversations between Griffin and Zaccor, that he has opened the door to the balance of the conversation.”
After hearing argument from both sides on this offer of proof by Times, the Trial Justice ruled that the written accident report and Times’ offer of proof concerning Griffin’s full oral report of the accident to Zaccor were both inadmissible.
It is no answer to the offer of proof made on this ground by Times to state, as the trial court did, ‘ ‘ that the initial questions as to the conversations with Mr. Griffin were put ” by counsel for Times, since under recognized rules of cross-examination, unless he called him as his own witness, counsel for the plaintiff would not even have been able to question Zaccor about Griffin’s *498 report had the matter not been mentioned on his direct examination. The point at issue is not whether Times first raised the matter but whether the plaintiff’s attorney on his cross-examination of Zaccor so far exceeded the limits of proper cross-examination in bringing out further matters, which were not mentioned on direct examination and which created such a wholly erroneous impression in the minds of the jury as to the content of the oral report of the accident which Zaccor had received from Griffin, that Times clearly should have been afforded an opportunity to present the full account of this report to the jury.
In People v. Regina (19 N Y 2d 65), on cross-examination the defendant’s counsel asked the witness if he had made any notes of the occurrence ‘ ‘ that night, ’ ’ and he replied in the negative. On redirect examination the People were allowed to establish, over the objection of the defendant, that the witness had made notes of the occurrence three days later. In upholding the ruling of the Trial Justice allowing this evidence to be introduced on redirect examination, this court stated: “the prosecution’s question on redirect examination was properly within the scope of matters gone into on cross-examination and did no more than to explain, clarify and fully elicit a question only partially examined by the defense. It was entirely proper (People v. Buchanan, 145 N. Y. 1, 23, 24; Richardson, Evidence [9th ed.], § 531).”
The order appealed from should be reversed and a new trial should be ordered, with costs to abide the event.