*344 OPINION OF THE COURT
Nat H. Hentel, J.
The usual lively strains of “Take Me Out to the Ball Game” struck a foul note on the evening of July 5,1978, at Shea Stadium for plaintiff Marie Uzdavines. On that occasion, the Metropolitan Baseball Club, Inc., known popularly as the “New York Mets”, was playing the Philadelphia Phillies; and plaintiff, her husband, son and daughter-in-law, were seated in a box section behind home plate some three or four rows back from the playing field fence, where they were approximately 40 feet distant from home plate.
Along about the third inning, after the game had progressed an hour or so,, batter Jerry Martin (of the Phillies) swung at a pitched ball, fouling it toward the seats behind home plate. Plaintiff’s son described the foul ball as being hit “straight back at a moderate upward angle; it was a line-drive backward.” The son saw the ball come off the bat, it came rapidly, and then he “suddenly did not see it until I heard my mother (seated directly behind him) moan”; at which time he looked around and saw her with her head down, and observed “the ball skipping backward, striking a couple of people behind her.” He also testified that he did not hear any noise of the ball hitting the vertical safety net screen between their seats and the playing field. He had waited to hear the sound of the ball hitting the net which did not come, and then he lost sight of the ball just as it was coming to the screen. He later testified that he saw the ball come through a hole in the screen, which he later contradicted by saying he lost sight of the ball at the screen, and he did not see the ball go through the screen.
Plaintiff’s husband testified that he was looking at the batter just before the incident when plaintiff turned to him and said something. She was seated to her husband’s right. According to him, he saw the pitch to the batter who thereafter hit the ball, and then “the ball came straight back towards us through the screen and hit my wife.” He further stated that the ball “came through the screen like a bullet, and that he heard it hit his wife’s head, but heard no *345 sound of the ball hitting or coming through the safety-screen.”
Plaintiff’s version of what happened placed her as watching the ball game seated right behind home plate three or four rows back in the grandstand. In the third inning, she turned to her husband on her left, and was then suddenly hit by a ball on the right side of her head, and she screamed. She stated that she did not see the ball coming, nor did she see where it came from, or what it was that struck her. “It happened so fast”, she said.
After being struck, plaintiff was assisted to the stadium’s first aid station where she was looked at by a nurse, and given an ice pack to hold to her head. An incident report was made at the aid station which recorded that plaintiff was “hit in the right cheek bone with a foul ball.”
Plaintiff and her husband then returned to their seats behind home plate at which time the husband reported looking straight ahead, and seeing a hole about 6 to 8 inches in diameter in the safety screen directly in front of them, and seeing “string hanging by the side of the hole.” And then, he observed “6 to 8 other holes in the screen with wire running through them.” The husband was not sure, but he testified “it was some kind of wire, or string, or line in the holes different than the rest of the mesh.” After sitting in their assigned seats a few minutes, the husband, after observing the holes, said “this is dangerous”, and he, his wife, son and daughter-in-law, all moved to unoccupied seats a few feet away — three or four seats removed — where the screen was not damaged. There they stayed until nearly the end of the game when they all left the stadium.
After the incident, plaintiff said she saw nothing when they came back to their seats because her head was down while she held the ice pack to her head. But she did say “we all looked at the screen in front of us”, and she noted that her seat “was where a little hole was” in the screen in front of her. She opined that she had been sitting 8 to 12 feet distant from the screen when the incident occurred, and that prior to the incident she had been watching the game, and had not seen any holes while she was looking straight *346 ahead. Before leaving the stadium, she also looked at the vertical screen and saw a hole there which she had not seen before. The hole was 6 to 7 inches in diameter. Her husband also stated that before the incident he had not observed holes in the screen even though he had to look through the screen to see the ball game, but did not notice any holes or string hanging down then.
Plaintiff’s Exhibit No. 1 in evidence is an official National League baseball which the court calculates as being 3V2 inches in diameter.
The son also looked at the screen after the incident, and said he saw a hole in the screen which “looked like it was made out of thin wire, more like chicken wire, and not the anchor type mesh wire found in fences.” He also said the wire net looked “rusty”, and that he “saw other holes with string hanging down and also with some wire.” He described the color of the string as being “greyish dirty”. He also stated he made these observations some 6 to 7 feet distant from the screen, and he also said “I knew what caused the incident from observation.” He also testified that this same screen had stopped many other foul balls that evening, and that he had made “no other observations of holes or pieces of string hanging down near them in the screen prior to the incident while he was watching the game looking through the whole screen.” Some four or five other foul balls had hit the screen prior to the incident and “some generally in our area”, according to his recollection, and he could “hear those balls crashing into the screen.”
Plaintiff, in commencing this lawsuit only sued the “Mets”, and did not sue the City of New York as the record owner of Shea Stadium. When the lawsuit was initiated, however, the “Mets” commenced a third-party action against the City of New York as third-party defendant. This was based upon the extensive and complicated lease arrangement between the City of New York and the “Mets”, as primary tenant, for the use of Shea Stadium during the baseball season.
In her complaint, plaintiff premised her cause of action for personal injuries on the theory that the incident complained of was due to defendant’s negligence in failing to *347 exercise “due and proper care in the management and control of the said stadium, more particularly, the net in question, in failing to make proper inspections of the said net, in permitting the net to be and remain in a state of disrepair, in permitting a hole or holes to become present therein; in that the said net as it existed was dangerous to patrons sitting behind home plate; in that the said defendant, its agents, servants and employees failed to make proper repairs to the said net; in that the net as it existed gave a false security to patrons sitting behind the aforesaid net, and in general in being careless and negligent in the premises.”
In its answer, defendant admitted that the net behind home plate “was placed to protect patrons sitting behind home plate from being struck by foul balls.” Defendant also admitted that it had leased the entire stadium known as Shea Stadium from its owner, the City of New York. Defendant further admitted that plaintiff had purchased a ticket of admission, and was lawfully occupying her seat at the time of the incident. Plaintiff, in her bill of particulars, states unequivocally that she makes no claim of actual notice of any alleged defect in the screen.
Thus, plaintiff predicates her complaint on two theories:
(1) common-law negligence; and
(2) negligence under the doctine of res ipsa loquitur.
The trial before the court and a jury was a bifurcated one in which the two theories were presented and charged to the jury for its determination as to whether defendant was negligent under either one of these theories. The court ruled, as a matter of law, after hearing all the testimony that there was no triable issue of fact as to plaintiff’s contributory negligence pleaded by defendant under New York’s comparative negligence law. The court, accordingly, directed a verdict in.plaintiff’s favor on that score.
Under section 2.1 of article II of the lease agreement dated October 6,1961, the City of New York granted to the Metropolitan Baseball Club, Inc. (hereinafter referred to as Metropolitan), a 31-year lease for the use of Shea Stadium, which was under construction at its inception.
*348 Article IV gives Metropolitan exclusive use of the stadium facility and grounds “for and in connection with the exhibition to the public of home games and related activities” during the baseball season. Indeed, the lease dictates that the city may not grant any other “stadium use authorization” without the prior written approval of Metropolitan within that period.
While the lease agreement is silent as to the erection, maintenance, and repair of the protective screening behind home plate, it does obligate Metropolitan to accept several maintenance functions inferentially related to this screening. Metropolitan is expressly responsible under section 17.1 of article XVII to maintain the surface of the playing field “in first class condition” during the baseball occupancy period. Section 17.5 of the same article refers to the outfield fence and directs Metropolitan “at its expense * * * (and) at the beginning of each baseball occupancy period, to remove from storage and erect, in the place provided therefor in the outfield, the movable sectional fence (or any replacement thereof) installed at the border”. A crucial section of the lease agreement is contained in section 20.1 of article XX whereby Metropolitan agrees to “properly police the stadium facility and the stadium approach area, and shall maintain order and protect property therein and thereon.” (Emphasis added.)
Article XXXIII speaks to inspection and gives the city permission to come upon the stadium facility in order to examine “the same for any legitimate reason”, and/or to check compliance with applicable laws or regulations. This provision, however, “does not impose upon the City, nor does the City assume by reason thereof, any responsibility, obligation or liability for the care, maintenance, supervision, repair or replacement of the stadium premises”.
The obligations of Metropolitan to indemnify and insure the city contained in articles XXV and XXVI, respectively, will be explored more fully hereinafter.
In his capacity as manager of Shea Stadium since 1974, Mr. John McCarthy, a Metropolitan employee, testified that he supervised approximately 30 Metropolitan employees on game days whose function it was to maintain the *349 field and grandstand during the game. He is and was in charge of maintenance of the playing field and the grandstand with the exception of structural and seat repairs.
Also, there were approximately 10 or 12 New York City Parks Department personnel whose responsibility it was to repair seats and structual defects.
On the evening of the accident, Mr. McCarthy was in the stadium, “roaming”, as was his usual custom. His testimony placed a ground crew, under his supervision, in the area directly behind home plate, whose duty it would be to prepare the field prior to the game, and in the middle of the game to repair the mound and home plate.
The witness acknowledged that there is and was protective security netting behind home plate in place on July 5, 1978. He described the netting as consisting of a horizontal and a vertical netting composed of galvanized wire with 2-by 4-inch openings. The total area of the screen is about 50 feet wide and between 15 and 20 feet high.
He stated that the seat in which plaintiff was seated at the time of her injury was within the confines of the netting. “It, [the screen], allows a spectator to look out and yet be protected from a foul ball”, he explained.
The witness further testified that he does not instruct any one of his crew to inspect the screen. No records are kept by him or by Metropolitan relevant to inspections, observed defects, repairs to, or changings of the screen.
However, he recognized that unscheduled inspections were indeed made by his crew. “Somebody would physically walk around and look and see.” He further elaborated: “More often than not I would get a call by people working in the area that there was something in need of correction, a screen hole, and I would rectify it.”
His testimony further revealed a general practice amounting to the assumption of a duty to make repairs by his crew on behalf of “The Mets * * * If I had known of it, it would have been fixed and repaired on the spot, whether by me or the Parks Department maintenance people * * * If there was a hole in the wire mesh, [we] would fix it even if it was not our job * * * On a * * * small scale, it would be fixed if somebody saw something * * * Anyone of our *350 people could do it, rectify it. You just take the bailing wire that’s needed.”
Among the causes of holes in the screen, he opined, were weather conditions, rust deterioration, children climbing on the screen, and bats hitting it when batters lost their grip in swinging. He also said that there could have been holes in the net prior to July, 1978.
The procedure described by the witness for making the repairs was using bailing wire available to the crew and tying the hole with it; “rectifying] it as best we can, making temporary repairs.” Otherwise, contact would be made with the city Parks Department by telephone to advise that the netting was in need of repair.
The witness denied checking repairs to. the safety screen once they had been made. The head groundskeeper directly supervised the making of the repairs.
Mr. McCarthy had no personal knowledge of any repairs made to the screening between the period of July, 1977 to July, 1978, but the witness admitted repairs could have been done that he was not aware of. The screen, he informed the court, was replaced approximately every two years and was last replaced in the spring of 1981, by a contractor hired by the Parks Department. He stated that the net was placed in position behind home plate to protect patrons from being hit by foul balls. He also admitted that there were holes in the net on occasion, and that such posed a danger to patrons.
At the end of defendant’s case, third-party defendant City of New York moved to dismiss the third-party complaint.
It is conceded by the parties, as corroborated by the lease agreement, that the City of New York owns Shea Stadium with the “Mets” having exclusive use as primary tenants during the baseball season. Plaintiff was indeed present on July 5, 1978, during the Mets-Phillies game. She was struck on the head by a foul ball as recorded by the first aid station at the stadium.
Thus, the issues finally to be addressed by the jury were: upon whose shoulders does the primary responsibility for the inspection and maintenance of the safety nets lie; and *351 what theory of liability flows therefrom? The lease agreement consented to by both the City of New York and the Metropolitan Baseball Club, Inc., and the testimony of witness McCarthy revealed at least joint control of the safety net.
Section 25.1 of article XXV of the lease provides: “Metropolitan shall indemnify the City against and hold the City harmless from all claims, suits and judgments (and all costs and expenses in connection therewith) for death, personal injuries and property damage as to which Metropolitan is required by § 26.6 to furnish liability insurance.”
Section 26.1 of article XXVI sets forth the following obligations: “Metropolitan shall, throughout the terms of this Agreement, insure the stadium facility * * * and all personal property of the City contained therein against loss or damage”.
Section 26.6 of article XXVI provides that Metropolitan shall maintain “a policy or policies, within the City named as an insured therein, providing the following liability insurance * * * (d) With respect to baseball occupancy periods * * * comprehensive general liability insurance against claims, suits, and judgments against the City and/or Metropolitan for death, personal injuries, and prop? erty damage arising out of or occurring during the operation, occupancy, maintenance or use of, or resulting from the acts or omissions of the City and/or Metropolitan and/or any employee or agent of either of them in or with respect to, the stadium facility and any part thereof” (emphasis added).
Thus, a third-party action by the “Mets” against the city could never result in the “Mets” escaping ultimate liability in light of the lease provisions set forth above. The indemnification and insurance sections of the lease would make any victory by the “Mets” against the City of New York an illusory one at best, with the “Mets” being the true party against whom the judgment would be entered. A suit then, by the “Mets” against the city is rendered meaningless. In this view, and upon the basis of witness McCarthy’s testimony, as well as that of plaintiff, her spouse and son, the court granted the third-party defendant’s motion to dis *352 miss the third-party complaint at the end of the entire case.
After the court’s charge on plaintiff’s two theories of the lawsuit, the jury deliberated and then rendered its verdict as follows: The jury did not find the “Mets” negligent under the common-law theory of negligence by a vote of 5 to 1; but did find defendant negligent under the res ipsa loquitur theory by a unanimous vote. Defendant moved to set aside the verdict fixing defendant’s liability under res ipsa loquitur as being against the weight of the facts and the law. Plaintiff moved to set aside the finding of the jury that defendant was not negligent under the common-law theory as being against the weight of facts and the law, and for a directed verdict in favor of plaintiff under the common-law theory of negligence. The motions were submitted and decision was reserved.
CONCLUSIONS OF LAW
Defendant’s motion to set aside the verdict fixing defendant’s liability under the doctrine of res ipsa loquitur presents an issue of apparent first impression under this particular set of facts. The court must undertake an analysis of the duty owed to plaintiff by defendant, and once having established that, seek to determine whether this duty supports a finding of “exclusive control” under the res ipsa loquitur doctrine. Only an affirmative answer to this query will support the jury’s finding of liability. Fortunately, guidance is furnished as to the duty of care owed to baseball game spectators by our State’s highest court.
In Akins v Glens Falls City School Dist. (53 NY2d 325, 327), the Court of Appeals was “called upon to define the scope of the duty owed by a proprietor of a baseball field to the spectators attending its games.” After examination of jurisdictions throughout the country, the Court of Appeals chose to adopt the majority rule and set it forth as follows (p 330):
“[T]he owner must screen the most dangerous section of the field — the area behind home plate — and the screening that is provided must be sufficient for those spectators who may be reasonably anticipated to desire protected seats on an ordinary occasion [emphasis supplied] * * *
*353 “We hold that, in the exercise of reasonable care, the proprietor of a ball park need only provide screening for the area of the field behind home plate where the danger of being struck by a ball is the greatest * * * In * * * providing adequate protection in the most dangerous area of the field for those spectators who wish to avail themselves of it, a proprietor fulfills its duty of reasonable care under such circumstances” (supra, p 331).
It is conceded that the lease agreement is mute on the express duty to maintain and inspect the safety screen in issue. The evidence reveals that the city replaces it approximately every two years, and that the “Mets” will make, and have on occasion made “temporary repairs”. To whom, then, does the duty of reasonable care flow, as mandated by Akins (supra)? Defendant urges that the city is responsible for the safety screen. The court turns to the ordinary meaning of the word proprietor. Webster’s New Collegiate Dictionary, 1975 edition, defines it as follows: “one who has the legal right or exclusive title to something: [an] owner, * * * one having an interest [as control or present use] less than absolute and exclusive right.”
The 1953 edition uses the word “usufruct” to describe a proprietor “in a wider sense”, meaning “the right of using and enjoying the fruits or profits of an estate or other thing belonging to another without impairing the substance.”
Clearly then, the duty to provide the protective screening falls both upon the City of New York as record owners of the stadium, and the Metropolitan Baseball Club, Inc., which profits from the use of the premises.
Under the Akins doctrine, once having provided a safety screen in the area most dangerous to spectators, may either a proprietor or a user allow it to fall into disrepair thereby inviting injury to those relying on the safety implicit in the purchase of a seat within the confines of the protected area?
It is, after all, elementary that when a party extends an invitation to the public to enter upon and use recreational areas, and accepts a benefit therefrom such as the purchase price of a ticket, it owes a duty of reasonable and ordinary care against foreseeable dangers. (Caldwell v Village of Is. Park, 304 NY 268, 274.)
*354 This duty requires that the “landowner must act as a reasonable man in maintaining his property in a reasonably safe condition in view of all the circumstances, including the likelihood of injuries to others, the seriousness of the injury, and the burden of avoiding the risk.” (Basso v Miller, 40 NY2d 233, 241, quoting Smith v Arbaugh’s Rest., 469 F2d 97, 100.)
“[T]he law evinces an intent to require certain parties to bear the responsibility of responding to those injured by reason of the breach of the respective duties, and it prohibits them from avoiding liability by the device of turning over the responsibility of performing the duty to another.” (Monroe v City of New York, 67 AD2d 89, 104.)
The court adopts the position that professional sports teams charging admission to assigned seats cannot shirk responsibility for personal injury, nor deny a duty to keep structures free from defects. They must be held to a standard of reasonable care at a minimum. (See New York Times, “Girl Hurt at Shea Seeks $2.7 Million and Fan Safety”, July 31, 1982, p 29, col 1.)
The court believes that a duty has clearly been imposed on the “Mets” via the Akins decision. It is equally well settled that even where one has no duty to plaintiff, but assumes a duty and chooses to perform, he is then under an affirmative duty to use reasonable care to see that the instrumentality provided, or acts done, are safe for the purpose for which they were to be used. (Prosser, Torts [3d ed], § 63, pp 418-420.)
The testimony reveals that the “Mets”, through its responsible employees, did notice and repair holes which developed in the safety screen in the ordinary course of events. The law requires that such repairs be done in a nonnegligent manner. Thus, the court finds that the “Mets” had a duty to provide protected seating, consonant to its duty to use reasonable care; and to keep the people seated in the area behind home plate free from foreseeable danger, because of the duty imposed upon it as primary user of the ball field, the benefits obtained by it from its use, and the reliance of the public on the safety of seats behind home plate, generally.
*355 Is there a basis then, to support a finding that the “Mets” were liable under a common-law theory of negligence? “In order to recover on the theory of common law negligence, it [is] incumbent upon plaintiff to establish that defendant owed [her] a duty of care, the breach of which caused [her] injuries. The owner of premises is bound to use reasonable care commensurate with the hazard to be apprehended and to maintain his premises in such a condition that those who go there at his invitation shall not unnecessarily or unreasonably be exposed to danger * * * To be charged with negligence for breach of this duty, an owner must have notice, either actual or "constructive, of the dangerous condition which caused the accident” (Monroe v City of New York, supra, pp 95-96; 46 NY Jur, Premises Liability, §48).
While the court has found the duty of care as set forth heretofore, the evidence will not support a finding of liability under common-law negligence, because of the absence of notice.
The testimony is not of sufficient weight to establish that the hole through which the ball passed was seen by the “Mets”, or whether it had been there long enough to provide constructive notice under the law. The string hanging from the hole testified to by plaintiff’s son might have been attached to a balloon or put there by a child. Its purpose invites mere speculation that will not support a verdict against the “Mets”. For this reason, the court denies the motion by plaintiff to set aside the jury’s verdict that defendant was not negligent under the common-law theory of negligence.
The more complex question before the court involves whether there is a legal basis for a verdict of negligence under the theory of res ipsa loquitur. Are the requirements of the doctrine of res ipsa fulfilled when there is a shared duty to maintain the safety net? Indeed, is a duty to maintain synonymous with exclusivity of control? The strict requirements of res ipsa have eroded in recent times, and the doctrine is now best expressed as follows: “The doctrine of res ipsa loquitur is not an arbitrary rule. It is rather a common-sense appraisal of the probative value of circumstantial evidence. It requires evidence which shows *356 at least probability that a particular accident could not have occurred without legal wrong by the defendant.” (Foltis, Inc. v City of New York, 287 NY 108,115; Galbraith v Busch, 267 NY 230; emphasis added.)
Having established the existence of a legal duty on the part of defendant to use at least reasonable care in maintaining the safety screen (Akins v Glens Falls City School Dist., 53 NY2d 325, supra), is there any force to its argument that joint control with the city, and other possible causes for the holes, such as vandalism, weather, flying bats, etc., absolve it from liability under the theory of res ipsa?
The elements of res ipsa loquitur, having been set forth many times by our courts, are well known: “(1) the event must be of a kind which ordinarily does not occur in the absence of someone’s negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant [emphasis added]; (3) it must not be due to any voluntary action or contribution on the part of the plaintiff and (4) evidence as to the true explanation of the event must be more readily accessible to the defendant than to plaintiff.” (See Fogal v Genesee Hosp., 41 AD2d 468, 474, and cases cited therein.)
There is no question that requirements (1), (3), and (4) have been met by plaintiff. The words exclusive control, however, have been the subject of much interpretation. The trend evident to this court is that “The requirement of exclusive possession and control is not an absolutely rigid concept.” (Feblot v New York Times Co., 32 NY2d 486; Cameron v Bohack Co., 27 AD2d 362, 364; emphasis added.)
“The exclusive control requirement is * * * subordinated to its general purpose, that of indicating that it probably was the defendant’s negligence which caused the accident.” (Corcoran v Banner Super Market, 19 NY2d 425, 432.)
“[R]eliance on res ipsa would not require plaintiff to establish exclusive control over the [instrumentality] but merely a degree of domination sufficient to identify defendant with probability as the party responsible for plaintiff’s injuries * * * Exclusive control of the offending *357 instrumentality is not essential, yet it remains plaintiff’s burden to develop such facts as warrant an inference of negligent conduct on the part of the defendant sought to be held responsible.” (Goree v Dixon, 62 AD2d 1078, 1079-1080; Chisholm v Mobil Oil Corp., 45 AD2d 776; Scimeca v New York City Tr. Auth., 39 AD2d 596.)
Clearly, the testimony elicited that employees of the “Mets” were in the area of the home plate screen on July 5, 1978, and that holes had been repaired by them in times past, creates the inference that it probably was defendant’s negligence which caused the accident in failing to repair properly or failing to notice the need to repair the screen in the first instance.
Defendant then cites instances of past vandalism in order to negate a finding of exclusive control. “The exclusiveness of control which is required to invoke the doctrine of res ipsa loquitur does not require the positive exclusion of all other possible agencies other than defendant, as the cause of plaintiff’s injuries.” (Scimeca v New York City Tr. Auth., supra, p 597.)
The speculation on the part of defendant as to the possibility of malicious acts which might have caused holes in the screen does not so weaken the inference of defendant’s negligence with respect to this particular kind of accident as to render the above-mentioned doctrine inapplicable. (See Nosowitz v 75-76 Polk Ave. Corp., 34 AD2d 648.)
The court finds that defendant, by its own testimony, has admitted either exclusive or at least joint control of the safety screen in fact as interpreted under the law. Both the “Mets” and the City of New York owed an independent duty to a spectator, and indeed a heightened duty arising out of the dangers reasonably to be anticipated from extending an invitation to the public' to sit in the most dangerous area of the stadium. This duty mandates that the “Mets” exercise strict control of the screen, assuring the public that they may rely on the implied safety of sitting in that area.
Considering all the circumstances, the indicia of sole, joint, or concurrent dominion or control over the safety nets to qualify for the application of the res ipsa doctrine are compelling:
*358 (1) This incident occurred during the height of the baseball season;
(2) the “Mets” were the sole and exclusive tenant-users of Shea Stadium and of its playing field and facilities;
(3) the “Mets” had their own grounds maintenance crew to keep the playing field in good repair, many of whom gathered near home plate during the playing of the ball games;
(4) The safety screens behind home plate must be considéred to be a part of the playing field within the purview of custom and usage revealed by Mr. McCarthy’s testimony;
(5) On becoming aware of holes in the home plate safety screen, the grounds crew of the “Mets” would make so-called temporary repairs with bailing wire despite the presence of New York City Parks Department personnel in the stadium, and without making reports to the Parks Department personnel, or keeping any records of such gratuitous maintenance when such repairs were made. Having thus assumed the risk and sole or coresponsibility of making repairs to the safety screens on sundry occasions, the “Mets” cannot now be heard to disclaim responsibility for such on the ground that sole dominion or control was lacking;
(6) the “Mets” sold tickets to the public for ball games to profit thereby, and to admit members of the public to seats behind home plate ostensibly representing to the purchasing public that such seats would hold the occupants without harm from foul balls because of the safety screens provided in that area;
(7) the “Mets” admit that under their lease from the city, the city was only required to keep the stadium seats in good repair as well as the structure of the stadium itself;
(8) The city changed the safety screens periodically, but the “Mets” never established that the city actively ever repaired holes in the safety screens;
(9) the “Mets” admitted that when holes in the screen came to their grounds crew’s attention, they repaired the holes without further action on the city’s part and without formal inspection records or repair reports of same having been made.
*359 Accordingly, on this record, the jury was free to conclude logically that defendant was at all times under a duty to maintain and control the protective screening for the safety of plaintiff who has purchased a ticket seating her behind the safety screen, thereby causing her to rely on its protection; and the injury from a foul ball was an accident that would not have occurred in the absence of defendant’s negligence.
Thus, the court denies defendant’s motion to set aside the jury’s verdict under the doctrine of res ipsa loquitur.
After considering all of the foregoing, the court denies both plaintiff’s and defendant’s motions, and sets the date for the second phase of this jury trial to determine the damage and injury aspects of this lawsuit — a personal injury action and an action for lose of services — for trial on September 24, 1982, at 9:30 a.m., before the undersigned in whatever part he may then be assigned.