■ WAYNE HAWKINS, Respondent, v BROOKLYN-CALEDONIAN HOSPITAL, Appellant, et al., Defendants. [658 NYS2d 375] —In an action to recover damages for personal injuries arising from medical malpractice, the defendant Brooklyn-Caledonian Hospital appeals from an order of the Supreme Court, Kings County (Spodek, J.), dated July 11, 1995, which denied its motion to set aside the jury verdict in favor of the plaintiff.

Ordered that the order is affirmed, with costs.

The plaintiff was admitted to the emergency room of the appellant hospital suffering from chest pains and shortness of

breath. It was later determined that one of his lungs had collapsed during an asthma attack. The course of treatment rendered to the plaintiff by the appellant hospital necessitated the use of intravenous lines. Apparently due to the plaintiff's long history of intravenous drug abuse, numerous attempts to maintain such lines in the plaintiff's hands and arms resulted in the needles infiltrating or puncturing the vein. Accordingly, it was determined that a catheter should be inserted into the plaintiff's subclavian vein, under his collar bone. The insertion of such a catheter was attempted, unassisted, by Dr. James Szalados, a resident at the appellant hospital. However, when the intravenous drip was commenced, it became apparent that the insertion had not been successful. Accordingly, the catheter was removed. X-rays of the plaintiff's chest revealed that, at some point during the procedure, the beveled tip of the catheter had sheared off and lodged in the plaintiff's chest, where it remained as of the time of trial. Examination of that portion of the catheter removed from the plaintiff (after being retrieved from the waste bin) confirmed that the tip had broken off. Meanwhile, an intravenous line was inserted into the plaintiff's right femoral vein, in the groin. The line was removed when the plaintiff's leg developed thrombophlebitis. The plaintiff thereafter commenced this action alleging, *inter alia,* that the failure of Dr. Szalados to obtain assistance before inserting the subclavian catheter, and his failure to properly insert the catheter, was a departure from good and accepted medical practice and a proximate cause of the plaintiff's various injuries. The jury returned a verdict in favor of the plaintiff awarding him $150,000 for past pain and suffering, and $175,000 for future pain and suffering. The appellant moved to set aside the verdict, which motion was denied. We now affirm.

The plaintiff's allegations concerning the insertion of the subclavian catheter were submitted to the jury, *inter alia,* under the doctrine of res ipsa loquitur. In order to support such a theory of recovery, a plaintiff must proffer proof (1) that the event is one which does not ordinarily occur in the absence of someone's negligence, (2) that the event was caused by an agency or instrumentality within the exclusive control of the defendant, and (3) that the event was not due to any voluntary action or contribution on the part of the plaintiff *(see, Kambat v St. Francis Hosp.,* 89 NY2d 489; *Dermatossian v New York City Tr. Auth.,* 67 NY2d 219). Some cases also consider the additional element of whether the evidence as to the true explanation of the event is more readily accessible to the defendant than to the plaintiff *(see, Cornacchia v Mount Vernon Hosp.,* 93 AD2d 851). Here, the plaintiff's expert, Dr. Richard

Bassin, although unable to state the exact manner in which the tip of the subclavian catheter had been sheared off, testified that such an occurrence was highly unusual and would not have resulted had proper technique been applied and good and accepted medical practice been followed. Indeed, he noted that X-rays of the plaintiff's chest revealed that the sheared tip of the catheter had been bent into an unusual "V" shape. Moreover, Dr. Bassin testified that the missing tip should have been detected immediately by examination of the removed portion of the catheter before disposal and the missing tip retrieved by use of a special wire. This evidence was sufficient to support both a prima facie case of negligence and a charge to the jury concerning the doctrine of res ipsa loquitur *(see, Kambat v St. Francis Hosp., supra; Mack v Hall Hosp.,* 121 AD2d 431; *Weeden v Armor El. Co.,* 97 AD2d 197; *Fogal v Genesee Hosp.,* 41 AD2d 468; *see also, Quigley v Jabbur,* 124 AD2d 398).

The appellant argues that various factual issues raised at trial vitiated the application of the doctrine of res ipsa loquitur and that the court erred in charging the jury under that doctrine. We disagree. The Court of Appeals has recently stated: "To rely on res ipsa loquitur a plaintiff need not conclusively eliminate the possibility of all other causes of the injury. It is enough that the evidence supporting the three conditions afford a rational basis for concluding that 'it is more likely than not' that the injury was caused by defendant's negligence (Restatement [Second] of Torts § 328 D, comment *e*). Stated otherwise, all that is required is that the likelihood of other possible causes of injury 'be so reduced that the greater probability lies at defendant's door' (2 Harper and James, Torts § 19.7, at 1086)" *(Kambat v St. Francis Hosp., supra,* at 494-495; *see also, Finocchio v Crest Hollow Club,* 184 AD2d 491; *Nesbit v New York City Tr. Auth.,* 170 AD2d 92; *Weeden v Armor El. Co., supra; Fogal v Genesee Hosp., supra).*

Here, the appellant argues that the fact that the plaintiff was conscious during the insertion of the subclavian catheter, and the testimony of Dr. Szalados that the plaintiff moved during the procedure, raised issues of fact as to whether the plaintiff was contributorily negligent, whether Dr. Szalados was in exclusive control of the instrumentality that caused the injury, and whether the true explanation of the event was more readily accessible to the appellant than to the plaintiff. However, Dr. Szalados' testimony that the plaintiff moved was contradicted by both the plaintiff and an attending nurse (an employee of the appellant), and was not supported by an appropriate entry in the plaintiff's medical record, an admitted

breach of proper procedure. Further, Dr. Szalados testified that a certain amount of movement was to be expected, at least during the initial aspects of the insertion procedure. Indeed, it was not disputed that the plaintiff was agitated at the time of the insertion, which, Dr. Szalados testified, was "very appropriate" given the plaintiff's medical condition. Thus, even crediting Dr. Szalados' testimony that the plaintiff moved and that such movement may have been one of "a combination of things" that culminated in the shearing off of the tip of the catheter, and assuming the continued viability of the third element required to warrant a res ipsa loquitur charge, i.e., proof that the event at issue was not due to any voluntary act of contributory negligence on the part of the plaintiff, in light of the change in the law concerning contributory negligence *(see, Dermatossian v New York City Tr. Auth., supra,* at 227, n 5; *Mack v Hall Hosp.,* 121 AD2d 431, *supra;* Prosser and Keeton, Torts, § 39, at 254 [5th ed]), the jury was still properly charged on the doctrine of res ipsa loquitur. Dr. Szalados' testimony would not have compelled a conclusion, as a matter of law, that a rational jury could not conclude that "it was more likely than not" that the plaintiff's injury was caused by the appellant's negligence rather than any contributory negligence by the plaintiff, or that the other possible causes of the plaintiff's injuries had become so increased that the greater probability of negligence no longer lay at the appellant's door. We note that, although not strictly relevant to a determination as to whether a res ipsa loquitur charge was warranted in the first instance, the jury, as a factual matter, found that the plaintiff had not contributed to his injuries.

In addition, the evidence at trial revealed no expertise or knowledge on the part of the plaintiff as to the expert medical procedure at issue, the relevant portions of which involved events occurring inside his body, or that the plaintiff in any way assisted or participated in the procedure. Thus, the mere fact that the plaintiff was conscious and may have moved during the insertion procedure would not have compelled a conclusion, as a matter of law, that a rational jury could not conclude that the defendant was in exclusive control of the instrumentality of the injury, i.e., the catheter, or that the true explanation of the event was more readily accessible to the appellant's agent, i.e., Dr. Szalados, who performed the procedure, than to the plaintiff. In sum, the jury was properly charged as to the doctrine of res ipsa loquitur.

Further, we cannot agree with the dissent that the testimony of Dr. Bassin as to whether Dr. Szalados should have obtained

assistance during the insertion of the subclavian catheter was incompetent as a matter of law because it was not based upon facts in the record or upon personal knowledge *(see, e.g., Kracker v Spartan Chem. Co.,* 183 AD2d 810; *Lipsius v White,* 91 AD2d 271). Although Dr. Bassin did opine incorrectly, but without objection, that Dr. Szalados appeared to be a first-year resident at the time that the procedure was performed, his assessment of the propriety of Dr. Szalados performing the procedure unassisted was not based on the year of his residency, but was rather based, *inter alia,* on the date that Dr. Szalados graduated from medical school, a date which is not in dispute. Indeed, Dr. Bassin's testimony was that any resident, not merely a first-year resident, should not have attempted the procedure unless monitored or supervised by an attending or experienced physician. Thus, Dr. Bassin's testimony was not incompetent.

In any event, this is not the only testimony which, if believed, would support the jury's finding that Dr. Szalados departed from good and accepted medical practice by attempting the procedure unassisted. Dr. Bassin testified that due to the risks inherent in the insertion of a subclavian line, the procedure should not be performed on a patient who was agitated unless the patient was sedated or restrained. Here, although sedation was not advisable due to the plaintiff's medical state, Dr. Szalados noted that physical restraint would have been possible. Indeed, the plaintiff testified that, prior to commencing the procedure, Dr. Szalados called for assistance, but that when assistance did not arrive Dr. Szalados proceeded unassisted. Dr. Szalados could not recall whether or not he sought such assistance, but agreed that it was good and accepted medical practice to seek assistance if a patient was agitated, an opinion shared by the appellant's expert. In sum, there was sufficient competent evidence to support the jury's verdict that the failure of Dr. Szalados to secure assistance during the procedure was a departure from good and accepted medical practice.

The damages awarded are not excessive. The plaintiff testified that he was warned that physical activity could cause the sheared tip of the catheter still lodged in his body to migrate, causing death. The plaintiff's expert, Dr. Bassin, agreed that, *inter alia,* physical activity could cause the tip to dislodge, leading to numerous complications, some of which could result in death. Such testimony sets forth a cognizable and compensable injury *(see, e.g., Ferrara v Galluchio,* 5 NY2d 16). Further, the plaintiff testified as to the initial painful effect of the thrombophlebitis in his right leg and its continued conse-

quences. Indeed, he testified that as a result, he had recommenced the use of illicit drugs after a period of sobriety in an attempt to self-medicate. Whether these assertions were to be credited and gave rise to compensable damages and, if so, whether the negligence alleged was a proximate cause of either or both events, were questions of fact for the jury *(see, Derdiarian v Felix Contr. Corp.,* 51 NY2d 308; *Gonzales v Fuchs,* 69 AD2d 831; *Veneski v City of New York,* 69 AD2d 858).* Finally, although these alleged damages were not expressly pleaded, the court did not err in allowing the plaintiff to proffer proof of such damages at trial in light of the appellant's failure to demonstrate that it was surprised or prejudiced thereby *(see, Sharkey v Locust Val. Mar.,* 96 AD2d 1093; Siegel, NY Prac § 242, at 362 [2d ed]).

We have considered the appellant's remaining contentions and find them to be without merit. Ritter, J. P., Pizzuto and Luciano, JJ., concur.

Friedmann, J. dissents and would reverse the order appealed from, grant the appellant's motion for judgment as a matter of law, and dismiss the complaint, with the following memorandum. I would reverse the order in favor of the plaintiff, grant the appellant's motion for judgment as a matter of law, and dismiss the complaint because, as I read the instant record, the plaintiff failed to present any competent proof at trial of negligence on the part of the appellant. Further, he failed to establish that he had suffered any compensable damage as a result of the actions of the appellant's agents.

The plaintiff, an intravenous drug user for some 19 years, was admitted to the appellant Brooklyn-Caledonian Hospital on June 30, 1987, suffering from a collapsed lung due to a severe asthma attack. The plaintiff was also experiencing heroin withdrawal, having had his last injection two days before. It is not disputed that the plaintiff's condition constituted an "emergency" situation requiring the use of intravenous lines for the administration of essential medications.

Some 10 separate attempts were made to insert a needle into various veins in the plaintiff's arms, but each time the needle infiltrated, or punctured the vein, because the plaintiff's vasculature had been damaged by his two decades of intravenous drug use.

In order to circumvent these difficulties, Dr. James Szalados undertook to insert a catheter into the plaintiff's subclavian vein. However, this catheter soon infiltrated, and, when he was informed of this fact by the attending nurse, Dr. Szalados withdrew the catheter and threw it away. Thereafter, the emer-

gency room attending physician, Dr. Rice, inserted an intravenous line into the plaintiff's right femoral vein, in the groin. Subsequently, a chest X-ray revealed that the tip of the plastic subclavian catheter had broken off and remained in the plaintiff's body. Dr. Szalados retrieved the catheter from the waste disposal unit and confirmed that the tip had indeed broken off.

It was the opinion of the various surgeons who were consulted on the matter that surgical removal of the catheter tip would be difficult, whereas leaving it in the plaintiff's body would pose no danger to the plaintiff's health.

Thereafter the plaintiff developed thrombophlebitis in his right leg, a known complication of femoral intravenous line use. After anticoagulant therapy, the phlebitis resolved itself. On July 24, 1987, the plaintiff left the appellant hospital "against medical advice", and, after missing two scheduled appointments and failing to take his medication, on August 22, 1987, the plaintiff was readmitted to the appellant hospital for treatment of another bout of phlebitis. Following his discharge on August 24, 1987, the plaintiff failed to keep his next clinic appointment, and indeed never again returned to the appellant hospital.

According to the plaintiff's theory of liability, based on the testimony of his expert Dr. Richard Bassin (who had reviewed the plaintiff's hospital record but had never personally examined him), the appellant was negligent in not requiring supervision of Dr. Szalados during his insertion of the subclavian catheter. According to Dr. Bassin, Dr. Szalados was fresh out of medical school, on his first day of internship, and was not qualified to perform such a procedure on his own. At the very least, Dr. Bassin opined, Dr. Szalados should have been supervised by "an experienced resident who has done many of these procedures". On cross-examination, however, Dr. Bassin admitted that he knew nothing about Dr. Szalados's "exact experience" with catheters, reiterating his belief that the younger physician had "just finished medical school". In fact, Dr. Szalados, who testified after Dr. Bassin, explained that at the time of these events he was a second-year resident with extensive experience in catheter insertion, and fully qualified to perform such procedures without supervision. Accordingly, because Dr. Bassin's opinion regarding Dr. Szalados's experience and need for supervision was not based upon the facts in the record, nor upon any personal knowledge of the facts, it was incompetent, and the verdict of liability predicated upon it should not stand (see, e.g., Kracker v Spartan Chem. Co., 183

AD2d 810; *Lipsius v White,* 91 AD2d 271; *see also, Cassano v Hagstrom,* 5 NY2d 643; *Matter of Miller v National Cabinet Co.,* 8 NY2d 277).

In addition, Dr. Bassin repeatedly testified that the breaking off of the catheter tip alone sufficed to prove that the defendants were negligent and had departed from accepted medical standards. However, it is well established that the mere happening of an accident or injury is not, without more, proof of a departure or of negligence on the part of a defendant *(see, e.g., Saliaris v D'Emilia,* 143 AD2d 996; *Henry v Bronx Lebanon Med. Ctr.,* 53 AD2d 476; *Wieland v Third Ave. Tr. Corp.,* 270 App Div 885, *affd* 296 NY 1047).

Dr. Bassin's misleading testimony was compounded by the court's error in charging the jury on the doctrine of res ipsa loquitur. The appellant had presented evidence that catheter tips sheared off on occasion without negligence on anyone's part, and there was also testimony that the plaintiff, who had been told to remain still during the catheter-insertion procedure, moved unexpectedly in the midst of it. This case is therefore not a proper one for a res ipsa loquitur charge, *inter alia,* because the shearing off of the catheter tip could have occurred in the absence of negligence, as well as because the appellant's agent was not necessarily in full control of the instrumentality that caused the injury *(see, e.g., Ebanks v New York City Tr. Auth.,* 70 NY2d 621, 623; *Dermatossian v New York City Tr. Auth.,* 67 NY2d 219; *Feblot v New York Times Co.,* 32 NY2d 486; *Raimondi v New York Racing Assn.,* 213 AD2d 708; *Troisi v Merit Oil Co.,* 208 AD2d 615; *DeSimone v Inserra Supermarkets,* 207 AD2d 615; *Cornacchia v Mount Vernon Hosp.,* 93 AD2d 851). In addition, it is by no means impossible that the plaintiff contributed to the shearing off of the catheter tip, and information as to the true explanation for the event is not any more readily accessible to the appellant than to the plaintiff *(see, e.g., Cornacchia v Mount Vernon Hosp., supra).*

The majority makes much of certain evidence suggesting that the plaintiff did *not* move during the procedure, as well as other testimony suggesting that the plaintiff had been so "agitated" prior to the catheterization that Dr. Szalados should not have attempted the insertion without assistance and/or restraints. However, in my opinion, these and other discrepancies in the evidence regarding the central issue in the case, namely whether Dr. Szalados properly exercised his professional judgment under the circumstances, should have been submitted to the jury with conventional instructions on

negligence and the credibility of witnesses. Instead, the court's misguided res ipsa loquitur charge reinforced Dr. Bassin's "accident equals malpractice" testimony, and essentially compelled the jury to find the appellant liable.

Even assuming that the plaintiff had succeeded in proving some breach of duty by the appellant, he failed to submit any admissible evidence that the breach had resulted in a compensable injury.

The court erred in granting the plaintiff's last-minute application to be allowed to testify that he suffered from continuing phlebitis and had become readdicted to heroin as a result of the broken catheter tip, when these "injuries" had never been pleaded or alleged in a bill of particulars over the seven years that the action was pending (*Zapata v City of New York*, 96 AD2d 779; *Mammarella v Consolidated Edison Co.*, 44 AD2d 571; *D'Onofrio v Davis*, 14 AD2d 960; Siegel, NY Prac § 242, at 362 [2d ed]). The prejudice to the appellant is self-evident, as there was no way that it could reasonably have been expected to be prepared for the variance at trial (*see*, Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C3025:15, at 364).

In addition, the plaintiff presented no medical evidence of continuing phlebitis after his second discharge from the appellant hospital, let alone evidence that such a condition could be traced to any negligence on the part of the appellant rather than to his own intravenous drug use (*Derdiarian v Felix Contr. Corp.*, 51 NY2d 308; *Gonzales v Fuchs*, 69 AD2d 831). Moreover, the plaintiff's novel contention that he had been drug-free for two years prior to his admission to the appellant hospital is belied by the record, which reflects that he had injected heroin two days before his admission, and that he repeatedly requested Methadone to help him endure the withdrawal he was experiencing during his inpatient stay.

The plaintiff's damages are thus reduced to the speculative fear that a small plastic catheter tip that is encased in scar tissue in his clavicle area and that has not moved in eight years, might suddenly begin to migrate and cause him harm. This fear of the plaintiff was supported at trial only by the conjecture of his expert, Dr. Bassin, who testified as follows: "The risk is that catheters do move, and if this catheter that's inside him moves, it could burrow into a vein or an artery, it can even burrow into the subclavian, patient could bleed to death, or if the patient has strenuous activity, physical activity and moves, that catheter could move. The catheter could also work its way to the outside. That's been known to happen, and

then you get infections that occur, and then it makes it even more difficult. But since the operation is so difficult to do, I would recommend close monitoring this catheter and not going back in now and operating". These dire predictions of possible future injury were not otherwise supported at trial by X-rays or any other scientific evidence documenting that the catheter tip had moved at all since 1987. Indeed, Dr. Bassin acknowledged that if the fragment did not move, the plaintiff would suffer no damage from its presence in his body, and could lead a normal life. The record before us establishes that the foreign object encased in scar tissue in the plaintiff's clavicle area has had absolutely no adverse effect on his quality of life to date.

Accordingly, I would reverse the order appealed from, grant the appellant's motion to set aside the verdict, and dismiss the complaint.