JOHN FOGAL, Individually and as Administrator of the Estate of EDITH FOGAL, Deceased, Respondent-Appellant, v. GENESEE HOSPITAL et al., Appellants-Respondents, and JOSEPH E. GEARY, Respondent.

Fourth Department, June 1, 1973.

*Woods, Oviatt, Gilman, Sturman & Clarke (Percival D. Oviatt, Jr.,* of counsel), for Gorman-Rupp Industries and another, appellants-respondents.

*Lines, Wilkins, Osborn & Beck (Stephen V. Lines* of counsel), for Genesee Hospital, appellant-respondent.

*Martin, Clearwater & Bell (Donald J. Fager* of counsel), for Joseph E. Geary and Richard C. Templeton.

*Vincenti & Schickler (Arnold S. Schickler* of counsel), for respondent-appellant.

SIMONS, J. These are cross appeals from a jury verdict and the judgment on it and from various intermediate rulings in an action seeking damages for personal injuries to the decedent, Edith Fogal, and derivative damages sustained by her husband, John Fogal.

Edith Fogal was injured as the result of the use of a hypothermia blanket to cool her body temperature during surgery. After exposure to the cold, Mrs. Fogal's feet, thighs and buttocks became necrotic necessitating excision of parts of her legs and buttocks and amputation of parts of both feet. She died February 21, 1971 before the trial of this action from causes unrelated to these injuries. Her earlier testimony taken during an examination before trial was read to the jury.

On January 29, 1965 Mrs. Fogal was admitted to the defendant Genesee Hospital under the care of defendant Dr. Geary, a vascular surgeon. She was diagnosed as "probable renal hypertension, and small abdominal aortic aneurysm" and underwent surgery on February 11, 1965 in an attempt to repair the artery or, as proved necessary, to remove the kidney. Because this surgery involves stopping the blood supply to portions of the body for extended periods of time, recognized surgical practice suggested the use of hypothermia to cool and slow the body's metabolism during the operation. Dr. Geary ordered this procedure. It was administered by the anesthesiologist, defendant Dr. Templeton, by use of an Aquamatic K-Thermia machine which was

manufactured by defendant Gorman-Rupp Industries, Inc. and sold to the Genesee Hospital by defendant American Hospital Supply Co., Inc. The machine was purchased by the hospital in October, 1964 and used prior to February 11, 1965. It was stored, maintained and supplied to the operating room by hospital personnel. After Mrs. Fogal's surgery the machine was ordered removed from service by officials of the hospital until tested by an independent laboratory in June, 1965. The laboratory determined that the electronic control unit designed to automatically maintain the patient's body at a constant temperature was defective. The manual controls were operative.

The hypothermia was accomplished by use of a blanket placed under the patient's body on the operating table. The blanket was cooled or warmed by circulating alcohol through tubes in it at preset temperatures. The points at which the body rested on the blanket were covered to prevent contact injuries and there is no claim here that Mrs. Fogal's injuries resulted from contact with the blanket. The temperature of the coolant is regulated by control units, either automatic or manual, monitored by the anesthesiologist. By presetting the " cold " dial to a desired temperature, in this case 48 degrees Fahrenheit,[1] the blanket will cool to that level. Similarly, there is a " high " dial for warming liquid to that level. The temperature at which it is desired to maintain the body during surgery is established by a third dial adjustment, in this case set at 89.6 degrees Fahrenheit (later raised to 93.2 degrees Fahrenheit). When set on automatic the machine is designed to cool until the desired body temperature (89.6 degrees Fahrenheit) is reached and then the automatic adjustment takes over and recirculates the warm liquid in the tubes in place of the cold to warm the blanket so that it maintains the patient at the prescribed body temperature. The hot and cold liquids alternate to keep the temperature of the body constant as recorded by an esophogeal probe or thermometer. It is one of plaintiff's contentions that since the automatic controls were subsequently found to be defective, the body never warmed but was continuously cooling throughout the time the patient was in the operating room from 8:00 A.M. until 1:05 P.M. The defendants claim that this is patently untrue because all the recorded body temperatures on the hos-

---

1. There is some dispute about this. The plaintiff maintains that the temperature was actually set at 38 degrees Fahrenheit and that the hospital records were altered before trial. The point is significant since the testing service found the machne readings accurate within 5 degrees and at 38 degrees Fahrenheit the blanket could conceivably be at freezing or close to it,

pital charts, as read from the machine's gauges (found by the laboratory to be accurate to 5 degrees) show that the proper body temperature was maintained.

At the time of the operation, Mrs. Fogal was 52 years of age, she had a prior medical history which included a heart attack 5 years before, hypertension and an unspecified problem with her "cervical arteries" in 1961. She was considered a poor risk for surgery by Dr. Geary and there is a notation on the hospital chart written by Dr. Templeton, "Poor risk", underlined several times and underneath that is written, "for hypothermia and endo-anesth". Dr. Templeton testified that this notation did not evidence any apprehended danger in the use of hypothermia; that it was intended to indicate that Mrs. Fogal was a poor risk for surgery and that hypothermia was to be used.

Plaintiff's complaint sought recovery from the defendant doctors on the theories of negligence and lack of informed consent, from the hospital for negligence and from the manufacturer and supplier for negligence. Although the plaintiff's complaint did not plead a cause of action against the manufacturer or supplier specifically denominated as breach of warranty, the court submitted the case to the jury against those defendants on both negligence and warranty (see Van Gaasbeck v. Webatuck Cent. School, 21 N Y 2d 239, 245; Diemer v. Diemer, 8 N Y 2d 206, 211–212).

The court dismissed the causes of action based on lack of informed consent and the case against the doctors and the hospital was submitted to the jury solely on the question of negligence. The court charged the doctrine of res ipsa loquitur as to them. A verdict was rendered against the manufacturer Gorman-Rupp Industries, Inc., the supplier American Hospital Supply Co. Inc., and the hospital. Verdicts of no cause of action were returned in favor of Dr. Geary and the jury was unable to agree on a verdict in the action against Dr. Templeton. The court apportioned the verdict among the three defendants held liable and ordered a new trial as to Dr. Templeton.

These cross appeals raise questions (1) whether the trial court properly dismissed the causes of action against the doctors based on lack of informed consent, (2) whether the case was properly submitted as to one or all of the defendants on the theory of res ipsa loquitur, and (3) whether the verdict against the manufacturer and supplier was supported by the evidence.

We conclude that a new trial is necessary on the issue of informed consent as to Dr. Geary, and on the issue of informed consent and negligence as to Dr. Templeton. The verdicts

against the hospital, the manufacturer and its supplier should be affirmed.

Under New York law a physician may be liable for failure to obtain the informed consent of his patient to a surgical procedure (*Darrah* v. *Kite,* 32 A D 2d 208, 210-211; *Fiorentino* v. *Wenger,* 26 A D 2d 693, revd. on other grounds 19 N Y 2d 407, 413; *Di Rosse* v. *Wein,* 24 A D 2d 510). The cause of action is not based on any theory of negligence but is an offshoot of the law of assault and battery. Any nonconsensual touching of a patient's body, absent an emergency, is a battery and the theory is that an uninformed consent to surgery obtained from a patient lacking knowledge of the dangers inherent in the procedure is no consent at all. There must be " a reasonable disclosure * * * of the known dangers * * * incident to " the proposed treatment (*Di Rosse* v. *Wein, supra*).

The definition of this duty to disclose and its scope have apparently never been explored by the courts of this State. As might be expected, there are conflicting views on the subject in other jurisdictions. Those views are thoroughly analyzed by the Court of Appeals in *Canterbury* v. *Spence* (464 F. 2d 772). Some jurisdictions have held that the duty to disclose and the required scope of the disclosure must be established by expert medical testimony of the standards of the medical profession. In *Canterbury,* the court held that the duty and scope of disclosure arise apart from medical considerations and are not governed by the profession's standards of due care but by the general standard of conduct reasonable under all the circumstances. This general standard recognizes the patient's prerogative to decide on the projected treatment whereas a medical standard is largely self-serving. We consider the *Canterbury* rule preferable and hold that a doctor is obliged to divulge to his patient the risks which singly or in combination, tested by general considerations of reasonable disclosure under all the circumstances, will materially affect the patient's decision whether to proceed with the treatment. This is not a retrospective determination. There should be no criticism of the physician unless the fact-finder determines that the information supplied was unreasonably inadequate (*Canterbury* v. *Spence, supra,* p. 787).

In this case there was evidence that the doctors recognized cold injury as a risk incident to the use of hypothermia, particularly to a person in the physical condition of Mrs. Fogal. Dr. Geary testified that he did, in fact, warn Mr. and Mrs. Fogal of that danger. The hospital record of Dr. Templeton also is evidence of his awareness of the danger. Both plaintiff and

Mrs. Fogal denied that cold injury was ever mentioned or suggested as an inherent danger in the operation. Whether they possessed sufficient knowledge of the risks of cold injury before consenting to the procedure was for the jury.

It is no answer that Mrs. Fogal did not state that she would have refused the operation had she known of this particular hazard. Whether she would have done so or not, her determination would have been subjective and her statement would not be conclusive evidence one way or the other. Whether the damage is causally related to the failure to disclose must be determined objectively. The question is not, what would Mrs. Fogal have decided, but what would a reasonably prudent person in Mrs. Fogal's circumstances, having sufficient knowledge of the material risks incident to the procedure, have decided (*Canterbury* v. *Spence, supra,* pp. 790–791). That the hypothermia was appropriate or necessary to the surgery is beside the point. The patient may always choose between two apparent dangers, one attendant upon surgery, the other resulting from the continuation of an existing condition because of a decision not to undergo surgery.

It is contended by the doctors and the hospital that the doctrine of *res ipsa loquitur* was not applicable on the facts of this case to establish negligence. The plaintiff attempted to show specific acts of negligence against those defendants and also relied upon *res ipsa loquitur* to establish a prima facie case. The procedure was permissible and the court correctly charged the jury on the negligence claims against the doctors and the hospital (see *Abbott* v. *Page Airways,* 23 N Y 2d 502).

It has been said many times that *res ipsa loquitur* is a rule of evidence which permits the jury to draw the conclusion from the occurrence of an unusual event that it happened through defendant's fault. It allows the jury to infer negligence and causation sufficient to establish a prima facie case based on circumstantial evidence of the facts attendant on the occurrence (*Griffen* v. *Manice,* 166 N. Y. 188). The conditions usually required before the rule may be applied are stated to be (1) the event must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not be due to any voluntary action or contribution on the part of the plaintiff and (4) evidence as to the true explanation of the event must be more readily accessible to the defendant than the plaintiff (Prosser, Torts [3d ed.], 218). The rule may be applied to the doctors and hospital

individually or jointly because each owed an independent duty to the patient and exercised concurrent control over the operation and equipment (*Matlick* v. *Long Is. Jewish Hosp.*, 25 A D 2d 538; and see *Corcoran* v. *Banner Super Market,* 19 N Y 2d 425).

It is apparent that if the jury was in a position to determine that this occurrence was one that would not ordinarly occur in the absence of someone's negligence, the prescribed four conditions for application of *res ipsa loquitur* have been met.

The defendants contend that Mrs. Fogal's injuries happened in spite of the exercise of care by them and that the result was one that might naturally occur without their fault. They claim that these facts do not permit an inference of negligence by a jury of laymen (*Pipers* v. *Rosenow,* 39 A D 240; *Dennis* v. *General Hosp. of Syracuse,* 30 A D 2d 639 [heart attack during minor surgery]; *George* v. *City of New York,* 22 A D 2d 70).

We think that those cases are distinguishable and that the inference may be drawn by the jury on the basis of their common experience and general knowledge that reasonable medical care was not given Mrs. Fogal in the application of this cooling procedure (Restatement 2d, Torts, § 328 D, Comment *d,* p. 158).

The patient was given "mild" hypothermia while undergoing surgery in the area of her kidney. Immediately afterward her injuries were evidenced by the mottled and discolored skin of her extremities. The defendant doctors testified that the cooling process went as they intended and without incident. They and their expert witnesses agreed that injuries of this type were possible risks of hypothermia but that such occurrences were rare and "extremely unlikely". This evidence allowed a finding that among all the possible causes for the harm, those which pointed to negligence on the part of the doctors and hospital are so probable under the circumstances, and those pointing to some other cause exonerating them so improbable, that the patient need not specify which wrong caused the harm. (*Pipers* v. *Rosenow, supra,* pp. 244–245.) We think it self-evident that a patient does not apprehend or accept amputation of the limbs due to frostbite as a normal risk of renal or vascular surgery. It is not an ordinary or natural result of such an operation in the absence of negligence. Generally, when an unexplained injury occurs in an area remote from the operation while the patient is anesthetized, the doctrine of *res ipsa loquitur* is available to establish a prima facie case (cf. *Dillon* v. *Rockaway Beach Hosp.,* 284 N. Y. 176; *Matlick* v. *Long Is. Jewish Hosp.* 25 A D 2d 538, *supra*; and see *Beaudoin* v. *Watertown Mem. Hosp.,* 32 Wisc. 2d 132).

The defendants claim that even if the doctrine applies, their evidence of proper care rebutted any inference of negligence. That evidence of care and other possible causes of the injury, such as the patient's physical condition, may be significant considerations to be evaluated by the jury in determining liability, but it does not negative the evidence that this was an unusual and extraordinary occurrence on which the jury could infer negligence under the doctrine of *res ipsa loquitur.* It does not remove *res ipsa loquitur* from the case and make the question one of law requiring dismissal of the complaint in absence of further proof by the plaintiff. Once the four preconditions for application of the rule are established by the plaintiff's proof, it may be charged to the jury. If the evidence, including the inference, is equally consistent with negligence or the lack of negligence, the jury may not infer negligence (*Cole* v. *Swagler,* 308 N. Y. 325), but the issue is one of fact even though the defendant offers rebuttal evidence and the plaintiff offers none in answer. Unless defendants' rebuttal evidence conclusively establishes that it is improbable that the injury was sustained through negligence of the defendants, the plaintiff is entitled to go to the jury (cf. *Benson* v. *Dean,* 232 N. Y. 52 and *Plumb* v. *Richmond Light & R. R. Co.,* 233 N. Y. 285, 288). In the case of *Gross* v. *Temp Realty Corp.* (5 A D 2d 825), cited by the defendant doctors, unrebutted evidence established conclusively that the accident was not unusual and probably happened because of the intervention of an outside agency. The court in that case ordered a new trial to allow plaintiff to prove specific negligence but denied her the right to establish a prima facie case by means of *res ipsa loquitur.*

The inference of *res ipsa loquitur* aside, viewing the proof in a light most favorable to the plaintiff (*Owen* v. *Rochester-Penfield Bus Co.,* 304 N. Y. 457), there was evidence from which a jury might spell out a cause of action founded on the theory that the patient was negligently cooled during and after the operation and that this lack of care caused her injuries.

Dr. Geary, as surgeon in charge, ordered the hypothermia, prescribed the body temperature during the operation, that it be raised and that it be discontinued. He was familiar with his patient's physical condition and chargeable with due care in her treatment. Dr. Templeton examined the patient before the operation and supervised the administration of anesthesia, including hypothermia, during the entire operation. The hospital, of course, owned, maintained and supplied the equipment which it is claimed was defective.

The testimony of Dr. Templeton, as given in his examination before trial, conflicts with his testimony on the trial. At his examination, he testified that he set the dials on the hypothermia machine to automatically reverse the cooling process and return the patient's temperature to normal. If, in fact, the automatic control was defective at the time, as it tested in June, the patient was left on a blanket set at 48 degrees Fahrenheit (or 38 degrees Fahrenheit) and continued cooling almost an hour longer than was necessary for the surgery, a procedure all doctors agree was improper. This contention is given support by the hospital records which indicate that there was no increase in the body temperature of Mrs. Fogal from the end of the cooling hypothermia at 12:10 P.M. until 2:15 P.M. At 1:45 P.M. the patient was taken from the operating room to the recovery room; however, she was left on the hypothermia blanket, which if cold, would have delayed the rewarming of her body. Under the circumstances the jury could infer that the anesthesiologist, charged with administering hypothermia, failed to properly supervise the patient's condition.

The evidence was sufficient to establish a prima facie case of negligence either on the basis of specific acts or omissions or on the basis of a permissible inference under res ipsa loquitur. We find no fault with the jury's determination in favor of Dr. Geary on the question of negligence or against the hospital on the subject. We affirm those findings and also the order of the trial court ordering a new trial on the question of negligence on either theory against Dr. Templeton. We perceive no difficulty in applying res ipsa loquitur in Dr. Templeton's case although the actions have been resolved against the others sharing joint control of the operation and the equipment (see Corcoran v. Banner Super Market, 19 N Y 2d 425, supra).

Finally, the verdicts against Gorman-Rupp Industries, Inc. and American Hospital Supply Co. Inc. should be affirmed. While the evidence in the case was circumstantial, it was sufficient to fix liability upon them. The plaintiff in a products liability case is charged with the burden of proving injury resulting from an instrumentality which was in a defective condition at the time it left the possession of the manufacturer or supplier charged with responsibility for the defect (Rosenzweig v. Arista Truck Renting Corp., 34 A D 2d 542; Cascia v. Maze Woodenware Co., 29 A D 2d 964). If the defective product while being used in the manner intended causes injury to a party which the injured party cannot avoid in the exercise of reasonable care, the manufacturer or supplier of the defective product is answer-

able for the damages sustained (*Codling* v. *Paglia,* 32 N Y 2d 330).

It is contended that these defendants surrendered possession of the equipment to the hospital more than four months before the operation and that it had been used without incident during that time and before the operation on Mrs. Fogal. Needless to say, the jury could have inferred from these facts that the Aquamatic K-Thermia machine and particularly its sealed control unit were free from defects at the time of delivery to the hospital. But the nature and existence of the defect may be shown inferentially (*Rooney* v. *Healy Co.,* 20 N Y 2d 42), and the jury could and did find liability on the evidence in the record. The facts closely parallel those in *Codling* v. *Paglia* (38 A D 2d 154, 160). In *Codling* liability against the manufacturer and retailer of an automobile was affirmed when the jury was permitted to infer the existence of a defect in an automobile steering mechanism. The automobile had been delivered to the customer by the defendants four months prior to the accident; it had been driven over 4,000 miles without incident or suspicion of any flaw before the accident occurred and only a few days before the accident the car had been inspected by a mechanic who found no need for repairs. The evidence supporting the jury's finding of liability in this case is at least equally as strong as the evidence in *Codling.*

The trial order dismissing the causes of action against the defendants Dr. Geary and Dr. Templeton on the issue of informed consent should be reversed and a new trial ordered solely as to that issue against Dr. Geary and on the issues of informed consent and negligence against Dr. Templeton. The judgments appealed from should be affirmed in all other respects.

WITMER, J. P., CARDAMONE and HENRY, JJ., concur.

Judgment, entered December 30, 1971, unanimously affirmed with costs.

Judgment, entered May 10, 1972, unanimously reversed on the law and facts and a new trial granted, with costs to abide the event, in accordance with opinion by SIMONS, J.

Order, entered October 17, 1972, unanimously affirmed.

Order, entered March 6, 1972, unanimously affirmed and new trial granted, with costs to abide the event, in accordance with opinion by SIMONS, J.