VIRGINIA R. WEEDEN, Appellant, v ARMOR ELEVATOR COMPANY, INC., Defendant and Third-Party Plaintiff-Respondent, et al., Third-Party Defendant.

Second Department, November 21, 1983

APPEARANCES OF COUNSEL

*Owen & Grogan* (*Thomas N. O'Hara* of counsel), for appellant.

*Mead, Dore & Vouté* (*Emanuel Thebner* of counsel), for respondent.

OPINION OF THE COURT

BOYERS, J.

In this negligence action, predicated upon injuries sustained while riding in an automatic elevator which allegedly rose and fell suddenly, plaintiff appeals from a judg-

ment entered upon a jury verdict for the defendant. Herein, we consider the application of the doctrine of *res ipsa loquitur* as against the defendant elevator maintenance company.

Since 1973, Virginia Weeden (hereinafter plaintiff) had been employed by the County of Orange as a maintenance or building service worker at the Orange County Government Center in the Village of Goshen, a three-story building owned by the county. In the early morning of May 24, 1976, plaintiff and Charles Smith, a fellow maintenance employee, entered the elevator in question, designated as elevator number one, on the first floor of the government center. Mr. Smith activated the control button so that they might ascend to the third floor. According to plaintiff, the elevator car "passed the third floor and went to the top * * * we hit something up there, the whole elevator shook, jolted through my whole body, my legs, and went down to the third floor and must have bounced back up again. The whole thing shook so badly that we thought it was coming apart. It threw me to the side and the back. The mid back hit the railing of the back of the elevator."

Similarly, Mr. Smith testified at trial that instead of stopping at the third floor, the elevator "went up, slammed, banged and dropped back down". When the elevator came to rest, approximately one to two feet off level, Mr. Smith picked plaintiff up, opened the door and helped her "climb out". (It is unclear from the testimony adduced at trial whether the elevator improperly leveled above or below the third floor, thereby requiring that plaintiff and Mr. Smith climb up or down in order to exit.)

Plaintiff continued working that day but could only perform some of her duties. She did, however, contact a physician that afternoon to make an appointment as she had pains in the back of her neck and in her shoulder and left leg. A compensation report was completed by plaintiff's supervisors the following day since her exclusive remedy against the county, her employer, was limited to workers' compensation (see *Murray v City of New York,* 43 NY2d 400, 407). Thereafter, in February, 1977, plaintiff instituted this action against Armor Elevator Company, Inc. (hereinafter Armor), the manufacturer and sole main-

tenance company under contract with the county to service elevator number one. Armor, in turn, commenced a third-party action against the county by which it sought indemnity or contribution in the event that it was held liable to plaintiff.

The matter came on for trial in late August and early September of 1981. There was substantial testimony from county employees delineating frequent prior problems associated with elevator number one. For example, the elevator cab would fail to level with the floor, the doors would not open at the appropriate time, and the cab would pass requested floors or stop in between. These ongoing problems were reported to Armor, according to Maintenance Supervisor Charles White and then Building Superintendent, Stanford DeGraw.

Armor's service contract with the county provided, *inter alia,* for periodic visits by Armor to furnish oil and grease and lubricate the elevator equipment, to adjust, repair and replace certain parts where conditions warranted, and to examine safety devices. The contract further required that Armor would respond to calls from the county for any conditions requiring adjustment or repair. Such routine visits were distinguishable from "call backs", which were made in response to specific customer complaints. Normal procedure upon the discovery of an elevator malfunction was for the county building maintenance staff to shut off the power and telephone Armor. The only other "maintenance" function performed by the county was the replacement of fuses, which were located in a separate room on the first floor near the elevator bank. There was conflicting testimony as to whether an out-of-order sign was placed on elevator number one after the incident on May 24, 1976, or whether the elevator remained operational that day. It is also unclear whether or not Armor was immediately notified of the incident.

Robert Ball, elevator mechanic, and Armor's service representative, had been tending the four Orange County Government Center elevators since 1974, two years prior to the incident. It was, he testified, his duty to service the elevators, which would include "general housekeeping as far as cleaning any oil leaks * * * checking the general

operation of the elevator, [and] checking contacts". He did not recall any repairs being performed on elevator number one between January 1 and May 24, 1976 or any complaints being received concerning the leveling mechanism prior to the occurrence. Ball's supervisor, Justin Donahoe, an Armor field operations manager, also testified that other than routine visits, there was only one recorded call with respect to elevator number one for attention to an unrelated problem. According to Mr. Ball, the last general service inspection prior to the incident had been on about May 20, 1976, at which time there was no evidence of malfunction. He first learned of the May 24 incident from Building Superintendent DeGraw during the course of a routine inspection and service call on June 1, 1976. While elevator number one was operating properly at the time, Mr. Ball considered the complaint serious enough to notify his supervisor, who directed that he change the "up-leveling section" as a precautionary measure, in the event that the up-leveling valve was acting erratically. The witness had not previously changed this mechanism.

Mechanic Ball described the relevant mechanism of elevator number one. The up-leveling section and the down-leveling section comprise a hydraulic valve which controls the speed of the elevator and allows the cab to stop smoothly when the valve receives an electrical signal from a magnetic switch atop the elevator. It was the up-leveling section of the hydraulic valve — which is responsible for the upward motion of the elevator cab and slowing its ascent so it is prepared to stop — which Ball changed after the incident. The elevator cab sits on top of a metal jack in the elevator shaft. Upon the institution of an up direction signal, in the motor room, adjacent to the shaft, oil is pumped from a tank into the jack, the oil pressure forcing the piston up and the elevator cab to ascend. When a down signal is activated, the down valve opens allowing oil to seep back into the tank thereby causing the cab to descend by the weight of gravity operating against the pressure of the oil. The elevator cab travels at a uniform maximum speed of approximately 100 feet per minute. According to Ball, however, it was "physically impossible" for the cab to hit the top of the shaft. This was because the hydraulic jack

was "long enough to allow the cab to go to the top floor and approximately 16 to 18 inches above the top floor and then at the end of the jack, to keep it from shooting out of the casing that it's in, there is a stop ring at the bottom of the jack in the casing in the ground * * * If the cab overrides the floor, the stop ring will hit the top of the casing and stop the car instantaneously". In the event the cab were to overrun the third floor, the stop ring would impede any further movement and the cab would remain stationary until a call button for a lower floor was activated.

The up-leveling head, which had been removed by Ball on June 1, 1976, was not produced at trial. Ball explained that after changing the valve head, he had given it to his supervisor, Donahoe. Donahoe testified to the procedure upon his receipt of a removed part. These items are sent to Armor's factory for repair or overhaul. He sent the up-leveling head removed from elevator number one to Armor's Queens plant with others from his catchment area. Because each valve part or head was not distinctly marked, the one from elevator number one could not be traced. The witness assumed that that particular part was rebuilt or repaired and recirculated or scrapped — he did not know.

At the close of trial, a specific request by plaintiff's counsel that the jury be instructed on the doctrine of *res ipsa loquitur* as against Armor was denied by Trial Term based (it would appear from the record) on the fact that the pleadings, as amplified by the bill of particulars, did not assert *res ipsa loquitur*. Trial Term held that the theory at trial had been that of negligence, and that, therefore, this was not a proper case for such a charge.

■■ After deliberation, the jury returned a verdict in favor of defendant Armor, finding that it had not been negligent in the maintenance of elevator number one. It is from the judgment entered thereon dismissing the complaint that plaintiffs appeal. We reverse and grant a new trial, holding that Trial Term erred in refusing to furnish the jury with appropriate instructions on the doctrine of *res ipsa loquitur*.

■ Initially, we observe that neither plaintiff's failure to specifically plead *res ipsa loquitur* nor the allegation of specific acts of negligence, along with a general allegation

thereof, by way of the complaint as amplified by the bill of particulars, constitutes a bar to the invocation of *res ipsa loquitur* where the facts warrant its application (see *Fogal v Genesee Hosp.*, 41 AD2d 468; cf. *Frew v Hospital of Albert Einstein Coll. of Medicine*, 76 AD2d 826; *DeRoire v Lehigh Val. R. R. Co.*, 205 App Div 549, 551; see, also, 1 Speiser, The Negligence Case — Res Ipsa Loquitur [1972], § 5:4; Prosser, Torts [4th ed], § 40, p 233; see discussion, Restatement, Torts 2d, § 328 D, Comment *m*).

Indeed the majority view, and that of our Court of Appeals, is that the introduction at trial by a plaintiff of specific evidence of a defendant's negligence will not preclude invocation of *res ipsa loquitur* unless the proof so adduced "actually refutes or negates the inference which might otherwise have been drawn from application of that doctrine" (*Abbott v Page Airways*, 23 NY2d 502, 511). As former Chief Judge FULD observed in *Abbott* (*supra,* p 512): "It is clear that there can be no logical or reasonable basis for requiring a plaintiff to choose between *res ipsa* and specific evidence of negligence or for precluding him from relying on *res ipsa* principles once evidence of negligence [has] been introduced, unless the two alternate modes of proof are fundamentally or inherently inconsistent." (See, also, 41 NY Jur, Negligence, § 93, 1983 Cum Supp, and discussion in Prosser, Torts [4th ed], § 40, pp 231-232, and 2 Harper and James, Law of Torts, § 19.10.)

Accordingly, we turn to the issue of whether the circumstances attendant upon the incident at bar warrant the application of *res ipsa loquitur* ("the thing speaks for itself") — an evidentiary principle, which since its first mention by Barron Pollock during the course of colloquy with counsel (*Byrne v Boadle*, 2 H & C 722, 159 Eng Rep 299 [1863]) and later delineation by Chief Judge EARLE (*Scott v London & St. Katherine Docks Co.*, 3 H & C 596, 159 Eng Rep 665 [1865]), has, *inter alia,* in its procedural and substantive application, occasioned differences of opinion, confusion, criticism and praise among our colleagues of Bench and Bar (see, e.g., 1 Speiser, *op. cit.*, § 1.2; Prosser, Torts [4th ed], § 39; Restatement, Torts 2d, § 328 D, Comment *a;* see, also, *George Foltis, Inc. v City of New York*, 287 NY 108, 121-122).

In our State, submission of a particular case to the triers of fact on the theory of *res ipsa,* with appropriate instruction by the court, is indicated where a plaintiff establishes the following conditions: " '(1) the event must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant [and] (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff' " (*Corcoran v Banner Super Market,* 19 NY2d 425, 430, mod on remittitur 21 NY2d 793 [quoting Prosser, Torts [3d ed], § 39, p 218]; *Moeller v Pearl,* 78 AD2d 540, 541).[1] Once these essential elements are established by plaintiff's proof, plaintiff having first established the nature of the instrumentality which allegedly occasioned the injury and its identity with defendant (*Manley v New York Tel. Co.,* 303 NY 18), the jury may be charged on *res ipsa loquitur* (*Fogal v Genesee Hosp.,* 41 AD2d 468, 476, *supra; see Davis v Goldsmith,* 19 AD2d 514).

That phrase stands for the proposition "that the fact of the occurrence of [an] injury, and the surrounding circumstances, may permit an inference of culpability on the part of the defendant, make out plaintiff's prima facie case, and present a question of fact for the defendant to meet with an explanation". (1 Speiser, *op. cit.,* § 6:53, p 323; 41 NY Jur, Negligence, § 87.) Essentially, "[a *res ipsa*] case is ordinarily merely one kind of case of circumstantial evidence, in which the jury may reasonably infer both negligence and causation from the mere occurrence of the event and the defendant's relation to it" (Restatement, Torts 2d, § 328 D, Comment *b; see,* also, Richardson, Evidence [Prince, 10th ed], § 93). Application of the rule is dependent on "whether, upon 'a commonsense appraisal of the probative value' of the circumstantial evidence, measured in part by the test of whether it is the best evidence available, [an] inference of negligence is justified" (*George Foltis, Inc. v City of New*

---

1. In *Fogal v Genesee Hosp.* (41 AD2d 468, 474), a fourth requirement was articulated, namely, that "evidence as to the true explanation of the event must be more readily accessible to the defendant than the plaintiff". Commentators have noted, however, that while this factor may constitute an important consideration, it should not be controlling (see 2 Harper and James, Law of Torts, § 19.9, p 1094; Prosser, Torts [4th ed], § 39, at pp 225-226).

*York,* 287 NY 108, 115, *supra;* see *Abbott v Page Airways,* 23 NY2d 502, 512, *supra).*[2]

In this forum, the evidentiary and procedural consequence of *res ipsa* is not that of a rebuttable presumption, but rather, that of a creation of a permissible inference or deduction of negligence from the facts and circumstances of the case (see *Shapiro v Art Craft Strauss Sign Corp.,* 39 AD2d 696; *Parsons v State of New York,* 31 AD2d 596; see, also, Richardson, Evidence [Prince, 10th ed], § 93; 41 NY Jur, Negligence, § 89; see, generally, discussion in 2 Harper and James, *op. cit.,* § 19.11). Its effect is to make out a prima facie case permitting submission to the jury, which may, but which is in no way bound to, infer negligence and conclude that the preponderance of proof is with the plaintiff (*Benson v Bohack Food Markets,* 33 AD2d 908; *Hatch v King,* 33 AD2d 879; see *Sweeney v Erving,* 228 US 233, 240).

Use of *res ipsa* does not, however, relieve plaintiff of the burden of proof. That onus never shifts to defendant (*George Foltis, Inc. v City of New York,* 287 NY 108, 115, 118, *supra*). Indeed, defendant need not offer any countervailing proof in rebuttal in order to prevail. *Res ipsa* merely permits the inference that an unusual occurrence resulted from defendant's negligence. "The jury has great latitude in [*the res ipsa*] case and, should the plaintiff prove a prima facie case, would nonetheless be justified at law in finding for defendant * * * Even where defendant offers no proof, it is still for the jury to decide, on plaintiff's proof, whether liability has been established" (*Chisholm v Mobil Oil Corp.,* 45 AD2d 776). Defendant may, of course, come forward with an explanation, thereby rebutting the inference raised by the doctrine (*Parsons v State of New York,* 31 AD2d 596, *supra*). And if such explanation is successful, plaintiff must rebut it or succumb (*Plumb v Richmond Light & R. R. Co.,* 233 NY 285). It is the rare case in which a plaintiff will be entitled to a directed verdict because the prima facie proof is so convincing that the inference arising therefrom is inescapable if not rebutted by other evidence (*George Foltis, Inc. v City of New York,* 287 NY 108, 121,

---

**2.** This does not negate the nondelegable character of the county's duty with respect to maintenance of the elevator (see *Rogers v Dorchester Assoc.,* 32 NY2d 553, 557; cf. *Mallor v Wolk Props.,* 63 Misc 2d 187, 195).

*supra; Horowitz v Kevah Konner, Inc.,* 67 AD2d 38, 41) or defendant will be entitled to a directed verdict because the rebuttal evidence is so overwhelmingly conclusive, it effectively overcomes any reasonable inference of negligence (see *Fogal v Genesee Hosp.,* 41 AD2d 468, 476, *supra*). Most commonly, the inference together with any rebuttal evidence creates a question of fact for the jury (see 1 Speiser, *op. cit.,* § 6:54; 2 Harper and James, *op. cit.,* § 19.11). As Judge SIMONS (now Judge of the Court of Appeals), formerly of the Appellate Division, Fourth Department, has written: "If the evidence, including the inference, is equally consistent with negligence or the lack of negligence, the jury may not infer negligence (*Cole* v. *Swagler,* 308 N.Y. 325), but the issue is one of fact even though the defendant offers rebuttal evidence and the plaintiff offers none in answer. Unless defendants' rebuttal evidence conclusively establishes that it is improbable that the injury was sustained through negligence of the defendants, the plaintiff is entitled to go to the jury" (*Fogal v Genesee Hosp.,* 41 AD2d 468, 476, *supra*).

■ Turning to the sufficiency of the proof adduced to fulfill the criteria for submission of plaintiff's case to the jury on the theory of *res ipsa,* we conclude that those three elements necessary to establish a basis for such invocation (delineated herein, *supra*) were present, and that accordingly, Trial Term's refusal to furnish the jury with the appropriate charge constituted error.

As to the first element, clearly the erratic behavior of elevator number one was neither an ordinary nor a natural experience (cf. *Allen v Woods Mgt. Co.,* 86 AD2d 530, 531), but, rather, the overshooting and off-leveling of the cab constituted an event which would not ordinarily occur were due care exercised in that vehicle's manufacture and maintenance (see discussion, 2 Speiser, *op. cit.,* § 15:17; see, also, Restatement, Torts 2d, § 328, D, Comment *c*). As to the third element, while in the case of an embarking passenger who is struck by a closing elevator door, that passenger's voluntary actions could have affected the happening of the accident (see *Feblot v New York Times Co.,* 32 NY2d 486, 495-496), the record here is bereft of evidence that any act by plaintiff contributed to the malfunction

complained of (cf. *Corcoran v Banner Super Market,* 19 NY2d 425, 430, *supra*).

Further, we are not persuaded by Armor's contention that the requisite second element of exclusive control of the injury causing instrumentality is lacking in this case. "Exclusivity" is a relative term, not an absolute. "The logical basis for [the control] requirement is simply that it must appear that the negligence of which the thing speaks is probably that of defendant and not of another" (2 Harper and James, *op. cit.,* § 19.7, p 1085). As Justice HOPKINS, formerly of this court, has observed: "The requirement of exclusive possession and control is not an absolutely rigid concept. It implies that the possession and control of the defendant over the instrumentality are of such a character that the probability that the negligent act was caused by someone other than the defendant is so remote that it is fair to permit an inference that the defendant is the negligent party" (*Cameron v Bohack Co.,* 27 AD2d 362, 364; see *Corcoran v Banner Super Market,* 19 NY2d 425, 431-432, *supra; Quinn v State of New York,* 61 AD2d 850, 851; *Chisholm v Mobil Oil Corp.,* 45 AD2d 776).

Here, the record demonstrates that all general maintenance and repair work on the operating mechanism of elevator number one was performed solely by Armor pursuant to its service contract with the county. The latter's "mechanical responsibilities" merely comprised the changing of fuses where necessary (such devices being located away from the immediate vicinity of the elevator bank), presumably, general housekeeping and cleaning of the visible interior and exterior portions of the cab, and the shutting off of power to any cab exhibiting a mechanical problem. In sum, the county relied upon Armor, as an expert in elevator maintenance, to locate and remedy any defects, and in such capacity, Armor had exclusive control of the inspection and maintenance of elevator number one (cf. *Otis Elevator Co. v Robinson,* 287 F2d 62, 65; *Rogers v Dorchester Assoc.,* 32 NY2d 553, 561). Accordingly, we conclude that the element of control is satisfied as against Armor.

To reiterate, we hold upon these facts encompassing the ascent and overshooting of an elevator cab, followed by its

descent and off-leveling upon stopping, the injured plaintiff passenger should have been entitled to invoke *res ipsa loquitur* against the maintenance company which had contracted to inspect and maintain such instrumentality (see 2 Speiser, *op. cit.,* § 15:17; cf. *Beinhocker v Barnes Dev. Corp.,* 296 NY 925, mot for rearg den 297 NY 472). In accord with our decision are cases in various jurisdictions which hold that the sudden and unusual movement of an automatic elevator causing injury to a passenger warrants an inference of some negligence on the part of the defendant maintenance company (see, e.g., *Otis Elevator Co. v Seale,* 334 F2d 928; *Commercial Union Ins. Co. v Street,* 327 So 2d 113 [Fla]; *American Elevator Co. v Briscoe,* 93 Nev 665; *Bond v Otis Elevator Co.,* 388 SW2d 681 [Tex]; see, also, Ann., 64 ALR3d 950, §§ 18-19, at pp 983-986). Obviously, our holding that, upon this record, this is a *res ipsa* case, imposes no intolerable burden of absolute liability on Armor (*Dittiger v Isal Realty Corp.,* 290 NY 492, 496).

Accordingly, the judgment of the Supreme Court, Orange County, must be reversed, and the case remitted for a new trial as to all parties upon which event the trial court should furnish the jury, *inter alia,* with appropriate instructions on *res ipsa loquitur* (see, e.g., sample charge and modification at PJI 2:65). We need not examine plaintiff's remaining contention in view of our disposition of the appeal.

MOLLEN, P. J., GULOTTA and BROWN, JJ., concur.

Judgment of the Supreme Court, Orange County, dated September 23, 1981, reversed, and new trial granted as to all parties, in accordance herewith, with costs to abide the event.