98

DIAGRAM B

(LANARD KAHUNA WATER GUN)

Kenneth SHEPARD, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 89 CV 892 (ERK).

United States District Court,
E.D. New York.

Jan. 11, 1993.

Steven Howard, Staten Island, NY, for plaintiff.

Mary Jo White, U.S. Atty., E.D.N.Y. by Kevin Cleary, Asst. U.S. Atty., Brooklyn, NY, for defendant.

## MEMORANDUM AND ORDER

KORMAN, District Judge.

Dr. Gordon Diehl graduated from Boston University Dental School in May of 1986. Tr. 5. On July 1, 1986, he began his residency at the Department of Veterans Affairs Medical Center in Brooklyn. *Id.* On October 27, 1986, in the second month of his surgical rotation, Dr. Diehl extracted the lower third molar of Kenneth Shepard, a veteran of the United States Army, who had complained of pain in the lower left quadrant of his mouth. Tr. 49, 58–59, 77. Because the tooth was impacted severely, Dr. Diehl sectioned it with a drill and removed it piecemeal. Sometime in the course of the extraction, Dr. Diehl severed the lingual nerve and caused Mr. Shepard to suffer permanent paresthesia, a condition marked by chronic numbness and difficulty in speaking for extended periods of time.

The lingual nerve is located on the tongue side of the third molar which is commonly referred to as a wisdom tooth,[1] in what laymen would refer to as the gum area. The figure below, which is taken from an article in the literature, is helpful in visualizing just how close the nerve is to the wisdom tooth:

---

1. The wisdom tooth, "the last tooth of the full set on each half of each jaw," derives its name from the fact that it is not "cut until the late teens." *Webster's Third International Dictionary* 2624 (1981).

FIGURE 1. Diagrammatic frontal section of the left third molar region showing the mean horizontal and vertical distances of the lingual nerve from the mandibular lingual plate and alveolar crest. [2]

The expert testimony adduced by plaintiff and the United States Attorney established that, notwithstanding the proximity of the lingual nerve to the wisdom tooth, the extraction of the wisdom tooth poses only "an infinitesimal risk" to the patient. Tr. 153. Specifically, Dr. Robert Himmelfarb, who was called by the United States Attorney, testified that if the procedure is performed with the requisite care and skill, the lingual nerve would be severed only in the rare case in which the nerve is located in such an anomalous position that injury to it is unavoidable. Tr. 153.

2. The "mean horizontal and vertical distances" shown in the figure are based on the dissection of thirty-four randomly selected cadaver heads. John E. Kiesselbach & Jack G. Chamberlain, *Clinical and Anatomic Observations on the Relationship of the Lingual Nerve to the Mandibular Third Molar Region,* 42 J. Oral & Maxillofacial Surgery 565, 565–66 (1984).

3. The lingual nerve can be severed when the anesthetic is administered by injection, when the incision is made in the gum, or when the

On the other hand, because the lingual nerve is not visible on an x-ray, and because it is in such close proximity to the wisdom tooth even when the nerve is located in its usual place, the extraction of the tooth is a particularly sensitive procedure that requires skill and care at every step of the process to insure that the nerve is not severed.[3] Indeed, Dr. Himmelfarb acknowledged that because of the proximity of the lingual nerve to the wisdom tooth, and because "it could be cut even if it's where it should be, ... you want to have it

tooth is sectioned with a drill. Tr. 53, 63, 70, 72. "The damage can be partial or total transsection [sic] of the nerve caused by poor flap design, uncontrolled instrumentation, or fracture of the lingual plate.... A less common ... cause of nerve damage is 'needle injury.' The incidence of this type of injury is low and, usually, the nerve heals in several weeks; however, in some cases, permanent lingual paresthesia occurs." Peter G. Mozsary & Robert A. Middleton, *Microsurgical Reconstruction of the Lingual Nerve,* 42 J. Oral & Maxillofacial Surgery, 415, 420 (1984).

done by the most experienced or able doctor possible." Tr. 153.

The extraction of plaintiff's wisdom tooth, however, was not performed by "the most experienced or able doctor possible." On the contrary, it was performed by Dr. Diehl, a resident in the second month of his surgical rotation, without the presence of an experienced surgeon in the room when the tooth was extracted. In this action, brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b) (1988), plaintiff argues that Dr. Diehl's lack of experience in performing a sensitive procedure of the kind in which the skill and experience of the surgeon is of particular consequence, combined with evidence that suggests that the severance of the lingual nerve is an extremely unusual occurrence in the absence of negligence, provides a basis for concluding that the cause of the injury here was negligence rather than the anomalous location of the nerve.

The issue of liability was severed for the purpose of trial and it was tried before me without a jury. I agree with the plaintiff that the evidence is sufficient to establish a *prima facie* case and to shift to the defendant the burden of explaining the manner in which Dr. Diehl severed his lingual nerve. Dr. Diehl testified that he performed the extraction in the manner in which he had been taught. If he followed this procedure, the United States Attorney argues, the severance of the nerve was unavoidable. I agree with plaintiff that Dr. Diehl's explanation, which tells us nothing about what he actually did here, is insufficient to bear the defendant's burden.

### Discussion

■ The argument of the United States Attorney that the plaintiff failed to establish a *prima facie* case simply ignores settled rules for the evaluation of circumstantial evidence in a case where only the defendant is in a position to supply direct evidence concerning the event in question.

If a plaintiff is not in a position to demonstrate the cause of his injury, the quantum of evidence necessary to establish a *prima facie* case is much lower than if it

would be otherwise. Particularly apposite here is *Noseworthy v. City of New York*, 298 N.Y. 76, 80 N.E.2d 744 (1948), a wrongful death action in which plaintiff alleged a negligent failure on the part of a subway motorman to stop his train in sufficient time so as to avoid hitting plaintiff's intestate. Because the decedent was not available to testify, the Court of Appeals held that "plaintiff is not held to as high a degree of proof … as where an injured plaintiff can himself describe the occurrence." *Id.* at 80, 80 N.E.2d 744. The Court of Appeals continued:

> [This rule] is based on the 'consideration' … 'that where the management and control of the thing which has produced the injury is exclusively vested in the defendant, it is within his power to produce evidence of the actual cause that produced the accident, which the plaintiff is unable to present.' [In fact,] it is a general rule of evidence, applicable to every sort of case, 'that where the defendant has knowledge of a fact but [sic] slight evidence is requisite to shift on him the burden of explanation.'

*Id.* 80–81, 80 N.E.2d 744 (quoting *Griffen v. Manice*, 166 N.Y. 188, 193–94, 59 N.E. 925 (1901) (citations omitted); *accord, Schechter v. Klanfer*, 28 N.Y.2d 228, 321 N.Y.S.2d 99, 269 N.E.2d 812 (1971).

■ Because Dr. Diehl performed the surgery without any witnesses present, and because he concededly severed the lingual nerve, this case fits within "the general rule of evidence, applicable to every sort of case," including medical malpractice cases, *Manginaro v. County of Nassau*, 172 A.D.2d 593, 594, 568 N.Y.S.2d 418 (App.Div.2nd Dept.1991), where "slight evidence" may provide a basis for an inference of want of care sufficient to shift to the defendant the burden of explanation.

The evidence here, however, is more than just slight. The probabilistic evidence provided by the United States Attorney, without more, establishes that, if performed with the requisite care and skill, the risk of severing the lingual nerve is "infinitesimal." Tr. 153. Indeed, Dr. Karl Hewtter, an expert called by the plaintiff, testified that if the extraction was performed properly, it was possible to avoid severing even an anomalously placed lingual nerve, al-

though he acknowledged that it could not be avoided in all such cases. Tr. 69–74. The testimony of Dr. Hewtter is confirmed by Dr. Diehl, who described the procedure used to avoid hitting "a high riding" lingual nerve, Tr. 19–20, and by Mozsary and Middleton, who have observed that because of the "high degree of variation" in the location of the lingual nerve, "[t]he occurrence of nerve damage during third molar removal can ... be decreased with careful surgical planning and buccal incisions." See Peter G. Mozsary & Robert A. Middleton, *Microsurgical Reconstruction of the Lingual Nerve*, 42 J. Oral & Maxillofacial Surgery, 415, 420 (1984).

The results of an extensive survey reported in the dental literature and offered by the defendant provides further support for this conclusion. Specifically, those responding to a survey of Fellows of the American Association of Maxillofacial Surgeons "estimated that they and their associates had performed third molar surgery in a total of 367,170 patients in the preceding five years." Charles C. Alling III, *Dysesthesia of the Lingual and Inferior Alveolar Nerves Following Third Molar Surgery*, 44 J. Oral Maxillofacial Surgery 454, 454 (1986). In 209 of those cases, or one in every 1,756 patients, some form of impairment to the lingual nerve was reported. Of those 209 cases, only 27 suffered permanent paresthesia of the kind that afflicts the plaintiff here. The rest recovered. *Id.* at 455.

If an abnormally high riding, or anomalously located, lingual nerve is found in one-quarter to one-half of one percent of the population and if severance of the lingual nerve cannot be avoided in those cases, as the defendant's expert, Dr. Robert Himmelfarb, testified, Tr. 53–54, 153, the study referred to above should have shown an impairment of the lingual nerve in at least one out of every 400, if not one out of every 200, extractions. Instead, the number was one out of 1,756. Accordingly, one inference to be drawn from this survey is that, if performed by experienced dental surgeons, who extract almost as many third molars in one week as Dr. Diehl extracted during his residency prior to severing plaintiff's lingual nerve, Tr. 49,[4] it is possible to avoid severing even an anomalously located lingual nerve. A second inference is that a lingual nerve, which is so anomalously located that its severance cannot be avoided, occurs in as few as one in 1,756 cases, far less frequently than even Dr. Himmelfarb suggested.

While there is support in case law for the conclusion that this probabilistic evidence alone is sufficient to establish a *prima facie* case, see *Dacus v. Miller*, 257 Or. 337, 479 P.2d 229, 230–31 (Or.1971); *Kaminsky v. Hertz Corp.*, 94 Mich.App. 356, 288 N.W.2d 426, 427–29 (App.1979), there is more here than a sense that the "odds" favor negligence as the cause of injury. There is the critical additional fact that a procedure that requires care and skill was performed without an experienced surgeon in the operating room, by a resident who had barely begun to perform dental surgery. Indeed, one can infer from the reluctant testimony of Dr. Himmelfarb and Dr. Diehl, Tr. 56–58, and the unequivocal testimony of Dr. Hewtter, that Dr. Diehl should never have been allowed to extract plaintiff's third molar "without supervision, direct and continual." Tr. 116, 119.[5]

Common sense suggests that a surgical technique designed carefully to avoid severing the lingual nerve is more likely to be bungled by a resident in training, "without supervision, direct and continued," than a dental surgeon who has acquired a mastery of the technique that comes only from regular practice. Dr. Terrance Stradford, another expert witness for the plaintiff, confirmed that without such supervision of Dr. Diehl "there would be a higher risk of possibly severing the nerve," Tr. 129–130.

---

4. "For a 250–day work year, the surgeons would have averaged between two and three patients per day for third molar surgery." Alling, *supra*, at 454.

5. Dr. Diehl let slip the admission that his supervisor should have been present when he used the drill to section the wisdom tooth, Tr. 58, and Dr. Himmelfarb failed repeatedly to give a direct answer to the question whether it was proper for Dr. Diehl to have performed the procedure without an experienced surgeon present in the room. Tr. 56–58.

Indeed, when asked whether he would have his wisdom tooth extracted "by somebody who's a month out of dental school and where there was no experienced dentist at least in the room with him at the time," Dr. Himmelfarb answered that he would have the extraction "done by the most experienced person" he could find. Tr. 56–57.

■ The possibility that the lingual nerve could have been severed because of its anomalous location, rather than Dr. Diehl's negligence, does not compel the conclusion that plaintiff has failed to make out a *prima facie* case. If that possibility were sufficient to preclude a judgment for plaintiff, it would mean that a plaintiff would be unable to recover against a defendant who admitted that he did not make the kind of incision necessary to avoid severing the lingual nerve. Notwithstanding such a departure from the accepted standard of care, a defendant could argue that, even if he had performed the procedure properly, it was possible that the nerve was located in such an anomalous position that it would have been severed anyway. Such an absurd result is not required under the case law. On the contrary, a plaintiff is not required to prove with certainty that his injury was caused by the negligence of the defendant. Rather, he need establish only that negligence was more likely than not the cause. As the Court of Appeals held in *Ingersoll v. Liberty Bank of Buffalo:*

> Where the facts proven show that there are several possible causes of an injury, for one or more of which the defendant was not responsible, and it is just as reasonable and probable that the injury was the result of one cause as the other, plaintiff cannot have a recovery since he has failed to prove that the negligence of the defendant caused the injury. This does not mean that the plaintiff must eliminate every other possible cause. 'The plaintiff was not required to offer evidence which positively excluded every other possible cause of the accident.' The existence of remote possibilities that factors other than the negligence of the

defendant may have caused the accident does not require a holding that plaintiff has failed to make out a *prima facie* case. It is enough that he shows facts and conditions from which the negligence of the defendant and the causation of the accident by that negligence may be reasonably inferred.

278 N.Y. 1, 7, 14 N.E.2d 828 (1938) (citations omitted); *accord, Bernstein v. City of New York,* 69 N.Y.2d 1020, 1022, 517 N.Y.S.2d 908, 511 N.E.2d 52 (1987)

■ Judged by the standard applicable to cases in which plaintiff is not in a position to produce evidence explaining the cause of his injury, *see, Noseworthy,* 298 N.Y. at 80, 80 N.E.2d 744, plaintiff has shown sufficient "facts and conditions from which the negligence of the defendant and the causation of the accident by that negligence may be reasonably inferred." *Ingersoll,* 278 N.Y. at 7, 14 N.E.2d 828. While this evidence is sufficient to shift to the defendant the burden of explaining how the lingual nerve was severed, see David Kaye, *Probability Theory Meets Res Ipsa Loquitur,* 77 Mich.L.Rev. 1456, 1481 (1979), Dr. Diehl was unable to provide any satisfactory explanation. Instead, when asked to explain the technique he used to extract plaintiff's wisdom tooth, he described what he was "taught from dental school" and what he was "told" at the Veterans Administration Hospital. Tr. 74. Dr. Diehl admittedly had no present recollection of the manner in which he extracted plaintiff's wisdom tooth, Tr. 12, and it seems clear that he was simply assuming that he performed the extraction in the manner in which he was taught.[6] Nor did the defendant introduce evidence conclusively establishing that it is improbable that the injury was sustained through the negligence of Dr. Diehl. *See Fogal v. Genesee Hosp.,* 41 A.D.2d 468, 476, 344 N.Y.S.2d 552 (App.Div. 4th Dept.1973); *Weeden v. Armor Elevator Co., Inc.,* 97 A.D.2d 197, 205, 468 N.Y.S.2d 898 (App. Div. 2nd Dept.1983). Under these circumstances, the explanation offered by Dr.

---

**6.** Dr. Diehl's testimony was based on notes he had made in the patient's charts. Tr. 29–30. The notes did not describe, in any specific de-

tail, the manner in which he extracted the tooth. Tr. 17–19.

Diehl is not sufficient to overcome the inference of negligence suggested by the evidence adduced by the plaintiff.

*Cassano v. Hagstrom,* 5 N.Y.2d 643, 187 N.Y.S.2d 1, 159 N.E.2d 348 *rearg. denied,* 6 N.Y.2d 882, 188 N.Y.S.2d 1027, 160 N.E.2d 96 (1959), which was not cited by the United States Attorney, does not require a contrary result. The plaintiff in *Cassano* alleged that her lingual and chordia tympani nerves had been severed as the result of the negligence of the dentist who removed her lower left wisdom tooth. Plaintiff's "whole theory of the action" was that the defendant had severed the two nerves "by improperly allowing his drill to penetrate the lingual periosteum which lies between the extracted tooth and these two nerves." *Id.,* 5 N.Y.2d at 645, 187 N.Y.S.2d 1, 159 N.E.2d 348. There was "no evidence direct or circumstantial that the instrument used by the defendant came near these nerves," and the defendant "swore not only that he did not cut these nerves but that he did his work on the other side of the tooth, that is, between the gum and the cheek, and did not drill through the tooth and out the other side." *Id.*

More significantly, aside from the absence of any evidence that the nerves were severed by improper use of the drill, plaintiff's expert in *Cassano* gave confusing testimony as to the possible cause of plaintiff's paraesthesia. Specifically, he testified that plaintiff had a "degeneration or destruction" of the lingual nerve and that he was certain that the condition could only come from a "severance or destruction or degeneration" of the nerves. *Id.* at 645, 187 N.Y.S.2d 1, 159 N.E.2d 348. The testimony pointing to "the degeneration of these nerves" as the cause of plaintiff's paraesthesia suggested "the possibility that the condition of the nerves might have been caused nontraumatically." *Id.* The Court of Appeals held that, where there is evidence that an injury could have been sustained even if due care was exercised, a plaintiff cannot prevail without evidence from which an inference of negligence may

be drawn. Because a narrow majority found such evidence lacking in the record, the Court of Appeals affirmed the dismissal of the complaint.

The present case is distinguishable from *Cassano* in several material respects. There is no dispute here that the lingual nerve was traumatically severed by Dr. Diehl when he extracted plaintiff's wisdom tooth. Tr. 7. Indeed, while impairment of the lingual nerve can be "caused nontraumatically", only a traumatic severance would account for paraesthesia following the extraction of the third molar. See Mozsary & Middleton, *supra,* at 415–16. More significantly, instead of trying to isolate the precise act of Dr. Diehl that severed the lingual nerve, which is simply not possible, plaintiff relies on circumstantial evidence that was not present in *Cassano* and that supports an inference that negligence may have been the cause of plaintiff's injury—evidence that the chance of severing the lingual nerve in the absence of negligence is "infinitesimal" and the fact that the tooth was extracted by a resident in training without supervision.[7]

■ While this evidence is sufficient for plaintiff to prevail under the New York standard for determining the sufficiency of the evidence, that standard is arguably more stringent than the federal standard. *See,* 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 2528, at 567–570 (1971). Under the latter standard,

> when a district judge is confronted with only two conflicting inferences, each of which he regards as equally probable, and there is no other possible explanation of the event, that, itself, strongly indicates that other judges and other reasonable men might rationally regard the one inference as more probable than the other.

*Wratchford v. S.J. Groves and Sons Co.,* 405 F.2d 1061, 1067 (4th Cir.1969); *see also, N.L.R.B. v. Marcus Trucking Co.,* 286 F.2d

**7.** Unlike the present case, the extraction in *Cassano* was performed by an oral surgeon to whom plaintiff had been referred by her family physician. *Cassano,* 5 N.Y.2d at 647, 187 N.Y.S.2d 1, 159 N.E.2d 348 (Burke, J., dissenting).

583, 592 n. 8 (2nd Cir.1961). Accordingly, where the record suggests only two equally probable causes for an injury, the trier of fact is free to choose either one. The inference of negligence here is more compelling than the inference that the nerve was severed because of its anomalous location. At the very least, however, each of these inferences is "equally probable." Thus, under the prevailing federal standard, the evidence is sufficient to allow the submission of the case to the trier of fact and to sustain a verdict for the plaintiff.

 Nor is the application of the federal standard precluded by the fact that New York law determines whether a cause of action lies against the United States. *See,* 28 U.S.C. § 1346(b) (1988). As Chief Judge Haynsworth observed in the context of a diversity case:

> [T]he rule as to the sufficiency of the evidence is not bound up with the primary rights and obligations of the parties. In a diversity case, state law defining and limiting those primary rights and obligations must be applied under the *Erie* doctrine, enabling members of society prudently to plan and conduct their affairs, whether their conduct will later be called into question in a state or a federal court. A choice of a rule as to the quantum of proof necessary to support the submission of a case to a jury plays no role in the ordering of the affairs of anyone. It is not the kind of rule which must inexorably find its governance in a diversity case in the corpus of state law. Indeed, ... there is little in this situation to support the choice of the state rule as opposed to the federal.

*Wratchford,* 405 F.2d at 1065–66. *Accord, Foster v. Ford Motor Co.,* 616 F.2d 1304, 1309 & n. 10 (5th Cir.1980); 9 Wright & Miller, *supra,* at § 2525; *cf. Donovan v. Penn Shipping Co.,* 429 U.S. 648, 649, 97 S.Ct. 835, 837, 51 L.Ed.2d 112 (1977) ("The proper role of the trial and appellate courts in the federal system in reviewing the size of jury verdicts is, however, a matter of federal law."); *Toth v. Yoder Co.* 749 F.2d 1190, 1194 & n. 2 (6th Cir.1984) (questioning prior precedent applying state law to determine sufficiency of the evidence); *But*

*see, Kudelka v. American Hoist & Derrick Co.,* 541 F.2d 651, 654 (7th Cir.1976) (applying state standard). This analysis applies with equal force to causes of action under the FTCA. *See, Shumaker v. United States,* 714 F.Supp. 154, 158 (M.D.N.C. 1988); *Denaux v. United States,* 572 F.Supp. 659, 662 (D.S.C.1983).

### Conclusion

I conclude that plaintiff has established a *prima facie* case sufficient to shift the burden of explanation to the defendant and that the explanation offered by the defendant is insufficient to overcome the evidence that plainly points to negligence as the cause of the plaintiff's paresthesia. Accordingly, I find for the plaintiff on the issue of liability.

SO ORDERED.